1
2
3
4
5
6
7
8

**UNITED STATES DISTRICT COURT**

9

**EASTERN DISTRICT OF CALIFORNIA**

10

11

TIMOTHY ALAN LOBRETTO,

12

   Petitioner,

13

  v.

14

D. K. SISTO, Warden,

15

   Respondent.

16
_____

) Case No.: 1:08-cv-00080-LJO-JLT
)
) FINDINGS AND RECOMMENDATIONS TO
) DENY AMENDED PETITION FOR WRIT OF
) HABEAS CORPUS (Doc. 14)
)
) ORDER DIRECTING THAT OBJECTIONS BE
) FILED WITHIN TWENTY DAYS
)

17   Petitioner is a state prisoner proceeding through counsel with a petition for writ of habeas

18 corpus pursuant to 28 U.S.C. § 2254.   (Doc. 1).

19

**PROCEDURAL HISTORY**

20   Petitioner is in custody of the California Department of Corrections and Rehabilitation

21 ("CDCR") serving a determinate sentence of 23 years, 8 months, pursuant to a judgment of the

22 Superior Court of California, County of Kings (the "Superior Court"), as a result of Petitioner's 2004

23 convictions for (1) two counts of false imprisonment effected without violence or menace (Cal. Pen.

24 Code § 236); (2) three counts of second degree robbery (Cal. Pen. Code § 211); (3) one count of

25 second degree burglary (Cal. Pen. Code § 459); (4) one count of assault by means likely to produce

26 great bodily injury (Cal. Pen. Code § 245(a)(1); and (5) one count of assault (Cal. Pen. Code § 240).

27 (Doc. 14, pp. 2-3).

28

1

On November 30, 2004, Petitioner filed a direct appeal to the California Court of Appeals, Fifth Appellate District (the "5th DCA"), which was denied in an unpublished opinion on June 23, 2006. (Id., p. 3). Petitioner filed a Petition for Review in the California Supreme Court which was denied on October 18, 2006. (Id.).

The instant petition was filed on January 15, 2008. (Doc. 1). On February 28, 2008, Petitioner filed a motion to stay the proceedings in order to exhaust additional state court claims. (Doc. 8). On July 24, 2008, the Court granted Petitioner's motion for stay, and ordered Petitioner's counsel to file regular status reports regarding the exhaustion efforts. (Doc. 9). On January 14, 2010, the Court issued an Order to Show Cause why the stay should not be lifted in light of the fact that Petitioner had failed to file any status reports. (Doc. 11). On February 8, 2010, Petitioner's counsel filed a response indicating that Petitioner would file an amended petition withdrawing the unexhausted claims. (Doc. 12). On March 5, 2010, the Court ordered the stay lifted, and directed Petitioner to file an amended petition containing only exhausted claims within thirty days. (Doc. 13). On April 2, 2010, Petitioner filed the amended petition. (Doc. 14). On April 21, 2010, the Court ordered Respondent to file a response to the amended petition. (Doc. 16). On July 15, 2010, Respondent filed the Answer and lodged the state court record with the Court. (Doc. 23). On November 1, 2010, Petitioner filed a Traverse. (Doc. 29).

Respondent concedes that all grounds for relief in the amended petition appear to have been fully exhausted. (Doc. 23, p. 7).

**FACTUAL BACKGROUND**

The Court adopts the Statement of Facts in the 5th DCA's unpublished decision:

**A. Background and Facts Relating to the Crimes**

Defendant was an avid motorcycle enthusiast. In December of 1998, defendant approached others about forming an organized club. Defendant and others met at defendant's house and five of them agreed to form a new club, the Exiled Motorcycle Club (Exiled).

The members consisted of defendant, Paul Goonan, Richard Whitlock, Frank McDaniel, and Wes Seruntine. They designed a patch for the club using shades of orange and gray to align themselves with the red and white colors of the Hell's Angels Motorcycle Club (Hell's Angels). They designated the following March 15 as the birth date of their club, March 15 also being the celebrated birth date of the Hell's Angels.

2

Exiled held weekly meetings and collected dues. The group found a clubhouse location and fixed it up. Some members brought personal property to the club. When property was brought to the club, the individual would let the members know if the property was to remain personal property or was to become club property. Donated property was treated as club property, while lent property remained the personal property of the lender. Some property was purchased with club dues, for example the security system. Members always had the opportunity to come back and reclaim their personal property from the clubhouse. Andy Randazzo, Mark Craver, and others became members of the club. The members of the club wanted to be looked upon as a decent motorcycle club and did not want to get involved in illegal activities.

Exiled associated with Scream City Motorcycle Club in Fresno. Scream City eventually became the Fresno County chapter of Hell's Angels. Exiled members wore patches to indicate their affiliation and support for the Fresno Hell's Angels. Exiled was mentored by the Fresno Hell's Angels and received information to train them and align them with the established ways of the Hell's Angels. Exiled members would assist at Hell's Angels functions doing "flunky" work.

The Mongols Motorcycle Club is a rival to the Hell's Angels. The Exiled clubhouse was in Mongols territory. It was a subject of concern that Exiled members had to drive through Mongols territory when they traveled to and from their homes to the clubhouse.

In September 2000, Paul Goonan was deployed by the Navy on a cruise, at which time defendant and Craver left Exiled to instead associate with the Fresno chapter of the Hell's Angels. Before Goonan left on his cruise, he said something offensive to Cydnie Newsome, defendant's girlfriend, at the clubhouse. He said he loved her; he then grabbed her and kissed her. While she was trying to get away, they were interrupted and Goonan left the area. While Goonan was on his cruise with the Navy, he called Newsome and told her he was thinking about her. Cydnie handed the telephone to defendant. During Goonan's birthday party in February of 2001, Goonan verbalized that he wanted to perform a certain sexual act with Newsome.

In February of 2001 there was rising tension between the Hell's Angels and the Mongols motorcycle club in other parts of California. There was a concern that the Exiled clubhouse might be taken over by the Mongols because it was in their territory, or the Mongols might exact some kind of retaliation on Exiled. Exiled was instructed by Hell's Angels that if they had firearms they should always carry them and if they were going to ride anywhere they should do so in groups of two. Defendant was present during these discussions.

On February 24, 2001, Goonan spent the night at the Exiled clubhouse with his girlfriend, Angela Clark, and his son. On the morning of February 25, 2001, others arrived at the clubhouse, including defendant and Brian Wendt, sergeant of arms of the Fresno Hell's Angels. Defendant entered the clubhouse and took a shotgun, rolled it in a sheet and handed it to Wendt, who removed it from the clubhouse. Wendt also asked for the telephone list for the Fresno chapter of Hell's Angels. Wendt took the list and left with others, including Exiled members Wes Seruntine and Dave Wilson.

3

Seruntine and Wilson returned and told Goonan they had been instructed to burn any documentation in the clubhouse that had any ties to the Hell's Angels. They lit a fire and started to go through the paperwork in the clubhouse. Goonan objected. He called Randazzo, and Randazzo came to the clubhouse. Randazzo was very upset because they were burning some of his personal paperwork along with the paperwork affiliated with the Hell's Angels. Things got heated and different individuals grabbed weapons. Randazzo had a gun and told everyone to shut up. Seruntine and Wilson surrendered their Exiled patches because they wanted to affiliate with Hell's Angels and not Exiled.

On March 2, 2001, Goonan accepted an invitation to come to the clubhouse of the San Diego chapter of the Hell's Angels. There was an altercation at the clubhouse. While at the San Diego clubhouse, Goonan and a person named Perez had a discussion regarding a woman both Goonan and Perez had dated.

On March 3, 2001, Goonan went to a party held by the Fresno Hell's Angels. He went to show them their (Exiled) ranks had not changed and they were still supporting the Fresno Hell's Angels. Wendt questioned Goonan about his trip to San Diego. Members of the Hell's Angels instructed Goonan that they wanted to have a meeting with Exiled at their clubhouse on March 4th.

On March 4, 2001, Goonan, Randazzo, and two other Exiled members were present at the clubhouse. Eight members of the Fresno chapter of the Hell's Angels arrived in four or five trucks at noontime. Defendant was one of the eight individuals who arrived at the clubhouse.

Goonan went outside and met the group. Craver locked the gate of the fence surrounding the clubhouse. The eight individuals were all dressed in Hell's Angels attire. They entered the clubhouse. Defendant unplugged the telephones in the clubhouse and told all of the Exiled members to turn off any communication devices and pile them on the bar.

The Exiled members were told by the Hell's Angels that Exiled was no longer a club. The membership numbers were too low and they were not in a position to defend themselves. Exiled was told that their club was being dissolved for their own good and their own safety from the Mongols. The Exiled members were told to remove their patches from their clothing. Goonan was angry and told them they did not have the right to do this. They responded they did not care, they were shutting them down.

The Hell's Angels began removing items from the clubhouse and took them out to their trucks. The group took stereos, security equipment, compact discs, flashlights, a microphone, kitchen equipment, alcohol, memorabilia, and other items with a total value in excess of $2,000.

Goonan and Randazzo objected to the takings, but the Hell's Angels did not care about their objections. They did not try to stop the Hell's Angels from removing items because they did not want a conflict. Randazzo spoke up when they tried to remove the big screen television because he had paid for that with his personal funds. The Hell's Angels left the television, as well as a few other things, in the clubhouse. The Hell's Angels were at the clubhouse about two hours. Exiled members did not call the police because they were afraid of retribution. They

4

were told they could keep the clubhouse open but not as a motorcycle club. Defendant was one of the individuals removing items from the clubhouse.

After the March 4, 2001 incident Goonan, his girlfriend Clark, and others fixed up the clubhouse. They restocked the bar and bought decorative items with their own money. In addition, they installed a new security system they had ordered but not received prior to the March 4, 2001 incident.

Goonan and others decided they would have their usual open house type of event on March 8, 2001 at the clubhouse. The clubhouse now had a generic motorcycle type of atmosphere without showing support for any particular club.

On the evening of March 8, 2001, several people met at defendant's house. They took three vehicles to go to the clubhouse and remove property. There were no weapons carried by the group, but Cydnie Newsom (defendant's girlfriend) knew it was possible violence would be involved in the evening's events.

Goonan, Clark, Randazzo, Kim Hake and her boyfriend Bob Clay were at the clubhouse on the evening of March 8, 2001. Goonan and Clark were looking at the new security monitor in the clubhouse when they saw a group of trucks pull up quickly and park in the back of the clubhouse. Goonan ran outside and could tell the situation was hostile. He then ran inside the office, told Randazzo what was going on, and ran behind the bar.

Twelve individuals entered the clubhouse: Wes Seruntine and his wife Andrea, Terry Wilson, Cydnie Newsome, Mark Craver, David Wilson, Timothy Ogawa, Brian Wendt, Tim Farrell, Tommy Tracy, Jacob Cannegieter, and defendant. Defendant was one of the first people in the door. He came behind the bar and shoved Goonan out of the way. Defendant had shoved Goonan away from the place where a gun was kept under the bar. Defendant told Hake and Clay to leave. They left.

Newsome turned off the monitor for the security camera; she then went around the bar and grabbed the telephone. Cannegieter went around the clubhouse and closed all of the blinds. Tim Farpella secured all of the doors. Ogawa secured the front door and then stood in front of it.

When defendant first spoke to Goonan, he commented on the sexual comments that Goonan had made about his girlfriend, Newsome. As defendant screamed at Goonan, Craver started screaming at Randazzo. Several people were holding Randazzo against the wall. Craver hit him several times, as did others. Wilson ran from across the room at full speed and hit the top of Randazzo's head with both hands, like a pile driver, splitting his head open and temporarily knocking him out. The attackers removed Randazzo's gun from his pocket.

Clark saw two or three guns on the pool table during the altercation; one of the guns was disassembled. Newsome said there were "maybe" three guns inside the clubhouse on the pool table. One gun was from Goonan, one from Randazzo, and Newsome did not know where the other gun came from.

5

While Craver and others were beating Randazzo, defendant hit Goonan in the face five or six times. Goonan fell to the floor and tried to cover up. Seruntine and Cannegieter picked Goonan up while defendant was kicking him in the face. Seruntine also punched Goonan, who was now unconscious, while defendant held him.

While Randazzo and Goonan were being beaten, Clark was cornered by the women to keep her from helping Goonan. When the beating was finished, defendant had blood all over his hands and arms. He asked Clark if he needed to get an AIDS test. She said no. Defendant went into the bathroom and washed off the blood. Clark was granted permission by defendant to help Goonan.

Defendant gave Randazzo a rag so Randazzo could wipe the blood off of his face so he could see better to open the safe. Randazzo opened the safe and the group took all of the money out of it, estimated to be about $200. The group took the keys to the clubhouse, the liquor, the food, and other items. Defendant allowed Randazzo to keep some personal items.

Craver or defendant instructed Randazzo to change the title on the lease and to turn the clubhouse over to a motorcycle club named the Soldiers for Jesus.

Goonan was in bad shape. He was helped off the floor to Clark's car. Clark was told to walk to her car; five people including defendant walked behind her to the car. Defendant told Cannegieter to guard Clark until they were ready to let her leave; he held onto her car keys. Goonan suffered lapses of consciousness. Defendant told Clark to nurse Goonan back to health. Defendant told Clark she should not go to the police or tell anyone what happened because she knew who defendant was and who he represented. Defendant told her they would find her no matter where she was and they would finish what they started.

Defendant told Randazzo that if they went to the hospital or anything like that they would kill them. Defendant said, "you know who we are, we're everywhere, you know we'll find you, we'll kill you" or something along those lines.

Clark was allowed to leave. She drove, with Goonan in the car, to her apartment. She waited 40 minutes then she drove to Randazzo's house. She wanted to get a story straight with Randazzo before she went to the hospital. Randazzo was "busted up" but did not want to seek medical attention. They decided to say that Goonan had been jumped. She took Goonan to the hospital.

Goonan sustained trauma to his face. He had a tripod fracture of his right cheek and another fracture of a bone in his face. The injury was significant and required surgical repair. His face was put back together and fixed with two titanium plates and several screws. Goonan continued to suffer from hearing loss, a crushed nasal passage, and a loss of feeling to the right side of his face.

### B. Events Occurring After the Crimes

Initially Goonan and Clark lied to the police about what happened because they feared retaliation. They eventually came forward and related what happened.

6

On April 18, 2001, law enforcement wired Randazzo with a transmitter. He had a conversation with defendant about the March 8, 2001 incident. The audiotape revealed their discussing that defendant had a personal problem with Goonan. Defendant discussed that he was upset at the way things were happening at Exiled. Defendant also mentioned that there was a fear that the Mongols would take over the clubhouse and the incident was a "check."

On May 19, 2001, a field supervisor for the gang task force attended a motorcycle run in Selma. Jeffrey Morales was there in a Fresno Hell's Angels vest. He was with Craver and Ogawa. Craver and Ogawa were wearing "prospect" clothing, indicating they were not yet full fledged members of the Hell's Angels, but were considered prospects.

In July of 2001, law enforcement served search warrants and searched the homes of some of the participants in the March 2001 incidents, the Fresno Hell's Angels clubhouse, as well as the homes of some individuals believed to be members of the Fresno Hell's Angels.

A search at the home of Cannegieter produced a motorcycle with Hell's Angels emblems, a helmet with Hell's Angels stickers on it, a Hell's Angels jacket, a Hell's Angels vest, and other items.

At the home of Ogawa, officers found a Hell's Angels jacket, numerous weapons, telephone lists for various clubhouses, a body armor vest, and other Hell's-Angels-related items.

David Wendt's residence was also searched. Officers found documents related to the Hell's Angels, as well as Hell's Angels clothing. Weapons were also found in the home.

At the home of Wes and Andrea Seruntine, officers found a Hell's Angels vest, tee-shirt, hat, and a book.

George Tristan's home contained numerous items linking him to the Hell's Angels. In addition, a loaded shotgun and a knife were found in his home.

A Hell's Angels vest with Fresno patches and motorcycle items were found in the home of Henry Garcia.

The home of Bob Davis was searched. It contained photographs of Davis in Hell's Angels clothing and one picture showed him exhibiting several firearms.

Mark Craver's home was searched. It contained a vest with a patch indicating that Craver was a prospect with the Hell's Angels. It contained other Hell's Angels material as well as numerous weapons. All of the weapons were legal except the butterfly knife.

Officers served a search warrant at defendant's home on July 11, 2001. Defendant expressed anger at the officers who were pounding on his door. He refused to come out and/or follow orders. Defendant was forced to the floor. He was kicking and trying to get away. Defendant told the officers they were making a big mistake and did not know who they were messing with.

At defendant's home officers found a Hell's Angels jacket with patches indicating that defendant was a prospect with Fresno County chapter of the Hell's Angels. In addition, officers found a telephone list of various chapters, as well as other Hell's Angels telephone lists. Several guns were found in the bedroom with several boxes of ammunition. The guns were not seized because they were not stolen or otherwise illegal.

The clubhouse of the Fresno chapter of the Hell's Angels was searched. The main building contained a pool table, full bar, kitchen area, big screen television and a lot of Hell's Angels memorabilia. The clubhouse contained Hell's Angels signs, documents, books, and photographs. In addition, multiple guns and ammunition were found. Surveillance cameras and a cardboard box with a shipping label were found in the Hell's Angels clubhouse. Randazzo identified these items as having come from the Exiled clubhouse.

Jeffrey Morales testified at trial that he was currently a member of the Hell's Angels Fresno chapter. Morales pleaded guilty in 1990 to one count of conspiracy to manufacture and distribute methamphetamine. At the time of this conviction he was a member of the Haites Riders motorcycle club. He testified that he believed that Mike Lynch, Henry Garcia, Bob Davis, Brian Wendt, David Wendt, George Tristan, and Timothy Ogawa were either Hell's Angels or had been Hell's Angels. Morales did not know the status of defendant or Craver because he was not around at that time.

### C. Evidence Regarding Hell's Angels Organization

The Hell's Angels began in 1948 in San Bernardino. The club grew and there are now chapters throughout the United States, Canada, Western Europe, South America, Africa, Spain, Portugal, and New Zealand. The Hell's Angels are extremely territorial, along county lines. The current rival of the Hell's Angels is the Mongols.

Usually clubs are divided by county into chapters. Each chapter must have at least four members, although six are normally required. Membership can be in excess of 30 members. Each chapter has a president, vice president, sergeant at arms, secretary, treasurer, and oftentimes a trademark or copyright representative to enforce issues involving the insignia. The sergeant at arms collects intelligence about their members and others.

In the organizational structure of the United States above the chapters, there are West Coast Officers' Association and East Coast Officers' Association; they meet once a month. After each meeting, the officers fax information to the other areas to let them know what is going on worldwide. The meetings are attended by at least one representative from every chapter. Events usually occur immediately before or after meetings. They spend a lot of time at the meeting discussing how to profit from the Hell's Angels insignia yet still protect its use in certain instances strictly for use by the Hell's Angels. At other times meeting conversations are criminally related. The weekly meetings held by each Hell's Angels chapter are referred to as "church."

The Hell's Angels also have a world meeting. At least two representatives from every country must be at the world meetings. World officers' meetings are held two times per year.

8

In order to become a Hell's Angel, one must first be in the "one percenter" motorcycle community and start associating with Hell's Angels.  At this point, the individual becomes an associate. At the next level an individual is sponsored by a full member to become a hang-around. The individual then becomes a prospect, which requires a unanimous vote of the chapter. A unanimous vote is also required to become a full chapter member. The same types of rules apply to a motorcycle club wanting to become a chapter of Hell's Angels.

The Hell's Angels claim red and white as their colors and no other group can wear that color. Outlaw Motorcycle clubs wear a three piece patch and also a "1%" patch. A full member of Hell's Angels wears a three-piece patch. The top rocker of the patch says "Hell's Angels." The middle patch is the death head and the bottom rocker patch indicates the particular chapter of the member. A full patch member is a full member who may wear all three portions of the patch. In addition, only a full patch member may have a death head as a tattoo. Only full-fledged members can hug each other and give taps on the back.

In addition to the full patch and 1% patch, some Hell's Angels earn a "Filthy Few" patch. A Filthy Few patch can be earned by killing or assaulting someone for the benefit of the club. Filthy Few patches have more than one meaning, depending on the look of the patch. A Filthy Few patch with black lettering, a black border and double ss lightening bolts between the words "filthy" and "few" means that individual has committed murder.

As an individual moves up the membership ranks he is constantly tested. For example, if a full member vomits a prospect is expected to clean it up. Individuals are tested in other ways. It involves any kind of "taking care of business." (Hell's Angels often wear a patch that says "TCB" and that stands for "Taking Care of Business.") Taking care of business can range from being capable of violence, knowing how to fight, being able to manufacture methamphetamine, or having a good connection for drugs or guns.

Being a Hell's Angel requires loyalty to the Hell's Angels above loyalty to family or anything else. The ability to carry out violence and instill fear in others assists in rising in the ranks of the Hell's Angels.

The sergeant of arms keeps things under control and if violence is necessary he is in charge of organizing that. He also maintains intelligence on informants and narcotics officers. Common among all outlaw motorcycle gangs is hostility toward law enforcement.

The Hell's Angels have some common sayings and rules. For example, one of their sayings is that three people can keep a secret when two are dead. One of their rules is the "Rule of Three." The Rule of Three is demonstrated by the following example: If a Hell's Angel chapter wants to take control of a bar to sell drugs, the first time they go to the bar seeking control they are nice. If they are refused, they go in a second time wearing their patches and try to intimidate the owner of the bar and all the clients. If the owner still refuses to cooperate, then their third action would be something bad like beating the owner or burning down the bar.

### D. Criminal Convictions and Activities of Hell's Angels Members

Numerous law enforcement officials testified regarding particular criminal incidents involving

9

members of the Hell's Angels and many testified regarding criminal convictions of members of the Hell's Angels. We set forth the most egregious incidents in this discussion.

Renato Gianinni, a retired police officer from San Bernardino, testified about an incident he witnessed in 1997. During the incident, a citizen drove by a Hell's Angels party and accidentally bumped one of the motorcycles. Members left the clubhouse and beat up the driver while an 11- or 12-year-old child was on the floorboard of the vehicle. This incident was caught on videotape and the tape was played for the jury.

Jason Smith, a police officer for New Market, New Hampshire Police Department, was working the Laconia Motorcycle Week in New Hampshire in 1998. Sergeant Moyer of the police department yelled out that there was a fight when he saw a group of Hell's Angels chasing a male into the roadway. The intervention by police officers was at first unsuccessful as the Hell's Angels kicked, punched, pepper sprayed, and hit the responding officers with bottles and a police baton. Officer Smith gave a detailed account of this encounter and numerous photos of the incident were admitted into evidence.

Jaques Morin, a Royal Canadian Mounted Police Officer and a member of the International Outlaw Motorcycle Gang Investigators Association, testified regarding the Hell's Angels in general and their activities in Canada. He testified that one of the primary revenue making activities for the Hell's Angels is drug trafficking. Murder is one of the main things they participate in during territorial disputes. From drug trafficking, to murders, to controlling the sex parlors, any offense in the criminal courts and the Hell's Angels are involved in it.

Morin introduced Canadian criminal documents for Maurice Boucher, who started the drug war in 1995 against the Rock Machine. Boucher was convicted of two murders and one attempted murder for his activities. Morin testified that during the Hell's Angels drug war with the Rock Machine over 165 people were killed, and 261 arsons occurred. One hundred thirty-five Hell's Angels were arrested.

Morin testified about a drug raid in Canada where they seized over $6,000,000 in cash. Fifty people were found guilty and they were Hell's Angels or associated with the Hell's Angels.

Timothy McKinley, a former Federal Bureau of Investigations agent, testified about Hell's Angels and particular incidents of criminal activity involving Hell's Angels. He testified regarding a Hell's Angels member in Merced with a unique fighting skill. He would place his left hand on the side of his victim's skull and strike a vicious right hook, crushing the skull and killing the victim with one blow. His sweatshirt read "Right Hook New Look."
McKinley also testified regarding the 1978 Compton murders by the Hell's Angels. Margo Compton had been a prostitute for the then president of the California Nomad chapter of the Hell's Angels. An associate, Flash Gordon, also a Hell's Angel, was operating a massage parlor called the Love Nest. Margo was one of the masseuses at the Love Nest. In order to keep her in line, they kidnapped her twin four-year-old daughters and held them to ensure that Margo continued to prostitute. She eventually went to the police department. After she testified at the preliminary hearing, people broke into her residence and killed the person on the couch assigned to guarding her. Her now six-year-old girls fled to the bedroom and covered their

10

heads with a pillow. The triggerman lifted the pillow to see where their heads were, put the pillow back down and shot them. Then they killed their mother, Margo.

McKinley testified about the murder of William Ivan Grendolski. Grendolski left the Hell's Angels. It was reported that he was in bad standing, and the Hell's Angels were looking for him. He, his wife, his 17-year-old stepson, and his five-year-old daughter were murdered. It took 13 years and three trials to convict one of the two perpetrators and took 18 years to convict the other perpetrator. The individuals convicted of the murders were connected to the Hell's Angels.

McKinley testified about a judge in Ohio who issued a directed verdict in favor of a Hell's Angels in a murder case. The judge had been given a bribe. He was convicted of the bribe and died shortly thereafter in custody.

The prior convictions of Hell's Angels included: (1) solicitation of murder (David Winn, San Bernardino, California), (2) for conspiracy to commit racketeering and conspiracy to murder (Guy Castiglione, current president of San Diego chapter), (3) two counts of felony witness intimidation in 1984 (Ronald Liquori, San Diego), (4) burglary in 2000 (Billy Castellano, San Diego), (5) burglary and assault with force likely to cause great bodily injury in 2001 (Thomas Castiglione, San Diego), (6) assault and possession of cocaine in 2002 (Chris Yvonne, San Diego), (7) conspiracy to sell drugs (George Christie, Ventura), (8) conspiracy to sell or transport methamphetamine in 2000 and 2001 (Timothy Giradins, Ventura), (9) felony assault in 2000 (Sabin Reynosa, Ventura), (10) assault with a deadly weapon in 2000 (Michael Kapps, Ventura), (11) transportation of methamphetamine, conspiracy to possess methamphetamine and possession of methamphetamine in 2001 (Edward Gregory, Ventura), (12) numerous drug and weapons charges (Robert Hill, Ventura), (13) murder in 1994 (Thomas Health, Ventura), (14) possession of a controlled substance for sale and simple possession of methamphetamine (Jimmy Shankles, Ventura), (15) manufacturing methamphetamine in 1997 (James Elrite, president of the San Jose chapter), (16) conspiracy to distribute methamphetamine and aiding and abetting possession with intent to distribute methamphetamine in 1996 (Carl Serrano, San Jose), (17) possession of methamphetamine in 1996 (Gary Foster, who became a Hell's Angel in the Monterey chapter in 1997), (18) narcotics trafficking in 2001 (Rusty Coomes, president of the Orange County Hell's Angels), (19) possession of methamphetamine for sale (Robert Downey, Orange County), and (20)conspiracy to distribute methamphetamine (Timothy Dover and Arthur Carasis, Richmond).

### E. Criminal Street Gang Expert Opinion

Javier Gil-Blanco, a former San Jose police officer, testified that one of the primary activities of the Hell's Angels is criminal activity. He described the structural organization of the Hell's Angels and also described the tattoos that identify members of the Hell's Angels. It was his opinion that the Hell's Angels are a criminal street gang.

Thomas McKinley testified that one of the primary activities of the Hell's Angels is criminal activity, including assault with a deadly weapon, assault with force likely to cause great bodily injury, homicide, attempted homicide, illegal drug activity, witness intimidation, and threats to commit crimes resulting in death or great bodily injury.

The "cross-pollination" between Hell's Angels chapters is a substantial component of their success as a criminal organization. McKinley concluded that, even if Goonan made comments regarding defendant's girlfriend and although the Fresno Hell's Angels were inexperienced, the crimes were committed for purposes that benefited the Hell's Angels.

### F. Defense

Angela Clark was Lisa Martinez's roommate in 2000-2001. Martinez testified that Clark drank excessively. Martinez had conversations with Clark about Goonan. Goonan had a temper and said that if his belongings were taken or club money was not accounted for he would take matters into his own hands.

Kim Hake testified that she knew Goonan well enough to stay away from him. Goonan was a heavy drinker and so was Randazzo. Randazzo was known to carry weapons. Hake went to the Exiled clubhouse on March 8, 2001 with her boyfriend, Bob Clay. She learned that night that the club had been disbanded. Goonan said that everything in the clubhouse was now his.

George Swigart was in the Navy with defendant. Swigart became involved with Exiled when Goonan was not around and became a member in December of 2000. He was present on March 4, 2001 when the club was disbanded. The remaining four members took their patches off and everything that was affiliated with the "red and white" (Hell's Angels) went into a stove because they were a support club for the Hell's Angels but were located in Mongol territory. No one threatened anyone on the 4th, no doors were locked or closed, and Swigart did not see any weapons.

Defendant took the Exiled patches on March 4, 2001, but returned Swigart's patch to him about a month later. Goonan and Randazzo were not in favor of the idea of folding the club. Swigart went to the clubhouse the evening of March 8th. He was outside and did not witness what went on inside the clubhouse. Goonan and defendant exchanged words and were arguing about something Goonan had said to defendant's girlfriend.

Jaime Williford was present for several conversations among Goonan, Randazzo and Clark. They expressed their belief that the March incidents were not a Hell's Angels related activity, but they thought they were pushed by authorities to make it into a Hell's Angels activity. Goonan and Randazzo wanted to go after the people who beat them up and they were pressured into saying it involved the Hell's Angels. Goonan and Randazzo were afraid of Perez, from the San Diego Hell's Angels, and thought Perez was going to kill Goonan.

Defendant testified that he wanted to become a Hell's Angel but had never seen any of the criminal activities that had just been described at his trial. He had heard negative things about the Hell's Angels, but those stories were from a long time ago. He never saw anything illegal at any Hell's Angels events that he attended. He viewed the group as a professional group of motorcyclists.

Clark had caused problems with other members of Exiled, and members did not like it that Goonan could not control his girlfriend. Defendant resigned from Exiled in November of 2000. They still called him seeking advice and telling him what was going on with the club.

12

Defendant heard that Goonan was mouthing off about sexual things he wanted to do with defendant's girlfriend. In addition, the girlfriend told him that Goonan had forcefully kissed her and told her to leave the defendant. Defendant was not happy about these things.

Defendant told Exiled members they should burn anything having to do with the Hell's Angels. Defendant was at the clubhouse the day items were burned, but he was only there to pick up a gun to return to a former Exiled member. He picked up the weapon and left.

Goonan called a meeting at the clubhouse on March 4, 2001. Goonan started the conversation and said Exiled did not want to be a motorcycle club anymore. The Exiled members went into the office and when they came out they had removed their Exiled patches from their vests. They gave the patches to Brian Wendt. Craver and defendant told Randazzo about property they thought they should have; Randazzo told them to take it. The club owed money to defendant so Randazzo let him take other items also.

Between March 4, and March 8, 2001, defendant received numerous telephone calls from Exiled members. Defendant was tired of all of it and got a group together to go down and talk to Exiled. Defendant wanted everyone present who had anything to do with the property in the clubhouse. Goonan had invited others to the clubhouse for an open house on March 8, 2001.

Goonan told Hake and Clay they needed to leave. Goonan asked defendant what he wanted. Defendant said they were there to talk about the property and other matters. Goonan said all of the property was theirs. As they talked, Goonan was sidestepping his way to the bar area where a handgun was usually kept.

Defendant told Goonan he was going to make it easy on Goonan and they could settle their problems one-on-one. Goonan reached down to grab the gun. Defendant jumped over the bar and grabbed Goonan. They struggled. Defendant was afraid of Goonan. Defendant ejected the clip from the gun and put the gun on top of the bar.

While defendant was having a conversation with Clark, telling her what Goonan had said and done to defendant's girlfriend, he kept one eye on Goonan because he was sure Goonan had a knife in his hand.

Defendant heard a heated conversation between Randazzo and Craver about club money. Someone yelled out that Randazzo had a gun. Defendant glanced towards Randazzo and took his eyes off of Goonan. Goonan lunged at him with his right hand coming out from behind his back. Defendant blocked Goonan's arm and hit him as hard as he could in the face.

Goonan did not have a knife, but defendant thought he did. Defendant was not trying to kill Goonan, he was only trying to stop him. The two began trading blows and they both fell to the floor. Defendant hit Goonan several times in the back of the head until he stopped being a threat to defendant. Goonan said he had enough and defendant stopped hitting him. Defendant told Goonan not to get up. When Goonan started to get up, defendant kicked him with his tennis shoe.

13

Defendant walked over to Randazzo and asked him where the club money was. Randazzo said there wasn't any. Defendant shoved him because he was disgusted.

Defendant did not know that Goonan was badly hurt. He did not threaten anyone if they reported what happened or sought medical treatment.

People took property. Defendant told Randazzo that if he thought any of the property belonged to him he knew how to contact defendant to get it back. Defendant kept Goonan's motorcycle because Goonan had defendant's dining room table; defendant told Goonan he would return the motorcycle when he got his dining room set back.

Defendant explained the content of his conversation with Randazzo when Randazzo was wired by law enforcement. He repeated that the whole event was a personal thing between him and Goonan and among the current and former members of Exiled.

James Hernandez, a professor of criminal justice at California State University, Sacramento, testified as an expert on gangs and outlaw motorcycle clubs. He testified that different chapters of the Hell's Angels see membership and involvement in the Hell's Angels very differently. It was his opinion that the Hell's Angels are not a criminal street gang. Each chapter of the Hell's Angels organization is an individual entity. Although people involved in the organization may be involved in criminal activity, it is not a criminal organization.

He testified that law enforcement views the Hell's Angels as very bad and an enemy. He reviewed the material from the case and did not agree with the prosecution's experts' opinions.

(Doc. 23, Exh., pp. 3-22).

## DISCUSSION

I.     Jurisdiction

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution, laws, or treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3);  Williams v. Taylor, 529 U.S. 362, 375 n. 7 (2000).  Petitioner asserts that he suffered violations of his rights as guaranteed by the United States Constitution.  The challenged conviction arises out of the Kings County Superior Court, which is located within the jurisdiction of this court.  28 U.S.C. § 2254(a); 28 U.S.C.§ 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. Lindh v. Murphy, 521 U.S. 320 (1997), *cert. denied,* 522 U.S. 1008, 118 S.Ct. 586 (1997);  Jeffries v. Wood, 114 F.3d 1484, 1500 (9th Cir. 1997), *cert. denied*, 520 U.S. 1107 (1997), *overruled on other*

14

*grounds by* Lindh v. Murphy, 521 U.S. 320 (holding the AEDPA only applicable to cases filed after statute's enactment).  The instant petition was filed after the enactment of the AEDPA and is therefore governed by its provisions.

II.     Legal Standard of Review

A petition for writ of habeas corpus under 28 U.S.C. § 2254(d) will not be granted unless he can show that the state court's adjudication of his claim:

(1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2)  resulted in a decision that "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d);  Lockyer v. Andrade, 538 U.S. 63, 70-71 (2003);  Williams v. Taylor, 529 U.S. at 412-413.

A state court decision is "contrary to" clearly established federal law "if it applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases, or "if it confronts a set of facts that is materially indistinguishable from a [Supreme Court] decision but reaches a different result." Brown v. Payton, 544 U.S. 133, 141 (2005), citing Williams v. Taylor, 529 U.S. 326, 405-406 (2000). A state court decision involves an "unreasonable application" of clearly established federal law "if the state court applies [the Supreme Court's precedents] to the facts in an objectively unreasonable manner." Id., quoting Williams, 529 U.S. at 409-410; Woodford v. Visciotti, 537 U.S. 19, 24-25 (2002)(*per curiam*).

Consequently, a federal court may not grant habeas relief simply because the state court's decision is incorrect or erroneous; the state court's decision must also be objectively unreasonable. Wiggins v. Smith, 539 U.S. 510, 511 (2003) (citing Williams v. Taylor, 529 U.S. at 409).  In Harrington v. Richter, 562 U.S. ___ , 131 S.Ct. 770 (2011), the U.S. Supreme Court explained that an "unreasonable application" of federal law is an objective test that turns on "whether it is possible that fairminded jurists could disagree" that the state court decision meets the standards set forth in the AEDPA.  If fairminded jurists could so disagree, habeas relief is precluded.  Richter, 131 S.Ct. at 786. As the United States Supreme Court has noted, AEDPA's standard of "contrary to, or involv[ing] an

15

1   unreasonable application of, clearly established Federal law" is "difficult to meet," because the

2   purpose of AEDPA is to ensure that federal habeas relief functions as a "'guard against extreme

3   malfunctions in the state criminal justice systems,'" and not as a means of error correction. Richter,

4   131 S.Ct. at 786, quoting Jackson v. Virginia, 443 U.S. 307, 332, 99 S.Ct. 2781, n. 5 (1979)(Stevens,

5   J., concurring in judgment). The Supreme Court has "said time and again that 'an *unreasonable*

6   application of federal law is different from an *incorrect* application of federal law.'" Cullen v.

7   Pinholster, 131 S.Ct. 1388, 1410-1411 (2011). Thus, a state prisoner seeking a writ of habeas corpus

8   from a federal court "must show that the state court's ruling on the claim being presented in federal

9   court was so lacking in justification that there was an error well understood and comprehended in

10  existing law beyond any possibility of fairminded disagreement." Richter, 131 S.Ct. at 787-788.

11      Moreover, federal "review under § 2254(d)(1) is limited to the record that was before the state

12  court that adjudicated the claim on the merits." Cullen, 131 S.Ct. at 1398 ("This backward-looking

13  language requires an examination of the state-court decision at the time it was made. It follows that

14  the record under review is limited to the record in existence at the same time–i.e., the record before the

15  state court.")

16      The second prong of federal habeas review involves the "unreasonable determination" clause

17  of 28 U.S.C. § 2254(d)(2). This prong pertains to state court decisions based on factual findings.

18  Davis v. Woodford, 384 F.3d at 637, citing Miller-El v. Cockrell, 537 U.S. 322 (2003). Under

19  § 2254(d)(2), a federal court may grant habeas relief if a state court's adjudication of the petitioner's

20  claims "resulted in a decision that was based on an unreasonable determination of the facts in light of

21  the evidence presented in the State court proceeding." Wiggins v. Smith, 539 U.S. at 520; Jeffries v.

22  Wood, 114 F.3d at 1500 (when reviewing a state court's factual determinations, a "responsible,

23  thoughtful answer reached after a full opportunity to litigate is adequate to support the judgment"). A

24  state court's factual finding is unreasonable when it is "so clearly incorrect that it would not be

25  debatable among reasonable jurists." Id. ; see Taylor v. Maddox, 366 F.3d 992, 999-1001 (9th Cir.

26  2004), cert.denied, Maddox v. Taylor, 543 U.S. 1038 (2004).

27      The AEDPA also requires that considerable deference be given to a state court's factual findings.

28  "Factual determinations by state courts are presumed correct absent clear and convincing evidence to

the contrary, § 2254(e)(1), and a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state court proceedings, § 2254(d)(2)." Miller-El v. Cockrell, 537 U.S. at 340. Both subsections (d)(2) and (e)(1) of § 2254 apply to findings of historical or pure fact, not mixed questions of fact and law. See Lambert v. Blodgett, 393 F.3d 943, 976-077 (2004).

To determine whether habeas relief is available under § 2254(d), the federal court looks to the last reasoned state court decision as the basis of the state court's decision. See Ylst v. Nunnemaker, 501 U.S. 979, 803 (1991); Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004). Where the state court decided the petitioner's claims on the merits but provided no reasoning for its decision, the federal habeas court conducts "an independent review of the record...to determine whether the state court [was objectively unreasonable] in its application of controlling federal law." Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2002); see Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003). "[A]lthough we independently review the record, we still defer to the state court's ultimate decisions." Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002). Where the state court denied the petitioner's claims on procedural grounds or did not decide such claims on the merits, the deferential standard of the AEDPA do not apply and the federal court must review the petitioner's 's claims de novo. Pirtle v. Morgan, 313 F.3d at 1167.

The prejudicial impact of any constitutional error is assessed by asking whether the error had "a substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 623 (1993); see also Fry v. Pliler, 551 U.S. 112, 119-120 (2007)(holding that the Brecht standard applies whether or not the state court recognized the error and reviewed it for harmlessness). Some constitutional errors, however, do not require that the petitioner demonstrate prejudice. See Arizona v. Fulminante, 499 U.S. 279, 310 (1991); United States v. Cronic, 466 U.S. 648, 659 (1984). Furthermore, where a habeas petition governed by the AEDPA alleges ineffective assistance of counsel under Strickland v. Washington, 466 U.S. 668 (1984), the Strickland prejudice standard is applied and courts do not engage in a separate analysis applying the Brecht standard. Avila v. Galaza, 297 F.3d 911, 918 n. 7 (9th Cir. 2002); Musladin v. Lamarque, 555 F.3d 830, 835 (9th Cir. 2009).

17

1

**III.  Review of Petitioner's Claims.**

2     The instant first amended petition alleges the following as grounds for relief: (1) Ineffective

3  assistance of trial counsel; (2) California's Street Terrorism Enforcement and Prevention (STEP) Act

4  is unconstitutionally vague as applied and on its face and a violation of Petitioner's First Amendment

5  and due process rights; (3) admission of certain gang evidence unrelated to the crimes violated

6  Petitioner's due process rights; and (4) admission of evidence regarding weapons deprived Petitioner

7  of a fair trial.  (Doc. 14).  As discussed below, the Court rejects all of Petitioner's claims and

8  recommends that the amended petition be denied with prejudice.

9     A.   Ineffective Assistance of Counsel

10        1.   The 5th DCA's adjudication.

11  In its opinion, the 5th DCA rejected Petitioner's claim of ineffective assistance of counsel:

12     Defendant makes a series of challenges to admission of prejudicial evidence, to the
       qualifications of the expert witnesses as providing "prejudicial" evidence, and claims
13     prosecutorial misconduct. At the core of each of these claims is the underlying fact that defense
       counsel did not object to the admission of the evidence, did not challenge the qualifications of
14     the expert witnesses, and did not raise a claim of prosecutorial misconduct. These issues are
       thus best addressed under the rubric of whether defendant received the effective assistance of
15     counsel.

16     "The standard for showing ineffective assistance of counsel is well settled. 'In assessing claims
       of ineffective assistance of trial counsel, we consider whether counsel's representation fell
17     below an objective standard of reasonableness under prevailing professional norms and
       whether the defendant suffered prejudice to a reasonable probability, that is, a probability
18     sufficient to undermine confidence in the outcome. [Citations.] A reviewing court will indulge
       in a presumption that counsel's performance fell within the wide range of professional
19     competence and that counsel's actions and inactions can be explained as a matter of sound trial
       strategy. Defendant thus bears the burden of establishing constitutionally inadequate assistance
20     of counsel. [Citations.] If the record on appeal sheds no light on why counsel acted or failed to
       act in the manner challenged, an appellate claim of ineffective assistance of counsel must be
21     rejected unless counsel was asked for an explanation and failed to provide one, or there simply
       could be no satisfactory explanation. [Citation.] Otherwise, the claim is more appropriately
22     raised in a petition for writ of habeas corpus.' [Citation.] 'Failure to object rarely constitutes
       constitutionally ineffective legal representation.' [Citation.]" (People v. Gray (2005) 37 Cal.4th
23     168, 206-207.)

24     "[A] reviewing court will reverse a conviction on the ground of inadequate counsel 'only if the
       record on appeal affirmatively discloses that counsel had no rational tactical purpose for his act
25     or omission.' [Citations.]" (People v. Frye (1998) 18 Cal.4th 894, 979-980.)

26     …

27     c. Effectiveness of Counsel Before Trial

28

18

Defendant contends that he suffered through a string of pretrial attorneys who were incompetent in failing to properly investigate, track court dates, and communicate with him. He acknowledges that it is difficult to show how pretrial activities of attorneys might have resulted in a different outcome for the trial, but argues that he was prejudiced because his attorneys did not perform rudimentary research while evidence was fresh, they did not attempt to exclude the voluminous amount of evidence about Hell's Angels, and as the continuances mounted the People were able to marshal more evidence from their worldwide SOS to police agencies regarding the Hell's Angels. In addition, he argues he was prejudiced because he paid the prior attorneys thousands of dollars and then was forced to go to trial with an attorney he did not believe was a proper advocate because he could not afford another attorney.

As previously set forth, defendant was represented by a series of attorneys prior to trial. Some of the counsel substitutions were based on defendant's request to retain new counsel. One of his attorneys was removed from his case after the attorney suffered a self-inflicted gunshot wound shortly before trial was to begin. The matter was continued for some time to allow counsel to regain sufficient emotional stability to be able to proceed with this case competently. The trial court eventually appointed Oliver to represent defendant. Oliver had represented defendant early on in the proceedings. Days before trial defendant sought to substitute newly retained counsel in the place of Oliver. The court denied the motion.

We begin with defendant's argument that he was prejudiced because he could not afford to hire another attorney, having spent all of his money on the string of pretrial counsel who represented him incompetently. On October 1, 2004, four days prior to the date set for trial, defendant made a motion to substitute counsel. He wished to replace Oliver with retained counsel, Richard Green. Green told the court that he had met with defendant and that they had reached a financial agreement. The trial court denied the request because it was not made in a timely fashion. On October 4, 2004, defendant made a Marsden (People v. Marsden (1970) 2 Cal.3d 118) motion to remove Oliver as his counsel. In his motion he stated, "I have retained Rick Green at the rate of $25,000." Thus the record clearly refutes defendant's claim that he was prejudiced because he was unable to retain new counsel, having expended all of his resources on his prior ineffective counsel.

Defendant contends his prior counsel did not perform rudimentary research or investigative tasks while evidence and memories were fresh, significantly impairing his defense; claims his prior attorneys did not seek to exclude irrelevant and prejudicial evidence; and argues that the delay allowed the People to collect more damaging evidence regarding the Hell's Angels. We note the speciousness of the argument that he was prejudiced because prior attorneys did not seek to exclude prejudicial evidence when he has not shown that his trial attorney was somehow precluded from doing so. The remainder of his assertions of prejudice are speculative at best and do not satisfy defendant's obligation to show a probability of prejudice sufficient to undermine confidence in the outcome. Simply put, the record is not sufficiently developed for us to determine if a delay caused any damage to defendant.

d. Effectiveness of Court-appointed Trial Counsel During Trial

Defendant contends that his counsel at trial was ineffective because he decided in advance that defendant would be convicted, did an inadequate investigation, supported the prosecution's case by presenting an expert that supported the People's position, and failed to exclude irrelevant and inflammatory evidence.

First, defendant argues that his counsel did not aggressively pursue investigation of either the facts or the legal issues in this case. His basis for this argument is his contention that his counsel urged him to plead guilty early on in the case and just prior to trial expressed his evaluation of the case that defendant would probably be found guilty.

Defendant has not cited any authority that stands for the proposition that counsel's belief in his client's guilt is the basis for a claim of ineffective assistance of counsel. Defendant has not shown that his counsel's position was not accurate or affected his efforts in defending him at trial.

Defendant then cites piecemeal to snippets from the record to show that defense counsel did not properly investigate the case. Two instances involve defense counsel stating that some things needed to be checked out, yet there is nothing in the record to show that counsel did not check them out. Our review of the Marsden motions, that defendant seems particularly fond of quoting in piecemeal fashion, reveals that defense counsel pursued all viable avenues of investigation in a competent manner.

Defendant criticizes defense counsel because defense counsel evaluated some of defendant's proposed avenues of investigation and strategy as trivial. "A defendant does not have the right to present a defense of his own choosing, but merely the right to an adequate and competent defense. [Citation.] ... 'When a defendant chooses to be represented by professional counsel, that counsel is "captain of the ship" and can make all but a few fundamental decisions for the defendant.'" (People v. Welch (1999) 20 Cal.4th 701, 728-729.)

Defendant next criticizes the expert called by defense counsel. Defendant claims that defense counsel should not have placed him on the stand because "when the expert did not appear to be completely lost or flummoxed, his testimony made him another prosecution witness."

The defense expert, James Hernandez, a professor of criminal justice at California State University, Sacramento, teaches a course in gangs, and devotes about two weeks of it to deal with outlaw motorcycle clubs. He testified that different chapters in the organization see membership and involvement in the Hell's Angels very differently. He testified that the Hell's Angels' primary value is in motorcycles and this is the members' focus. He testified that in the Hell's Angels one man, one vote is their cornerstone, unlike typical street gangs. In addition, each chapter is an individual entity and each club runs things differently and treats the membership differently. He admitted that people involved in the organization may be involved in criminal activity but surmised that this was so because the organization disliked law enforcement and thus was a good place to hang out for people with criminal objectives. He testified that law enforcement views the Hell's Angels as the enemy and law enforcement wants to attack them.

As far as his opinion about the current crime, Hernandez testified that it was unlikely that there was an issue about Mongols moving into the Exiled clubhouse because Hanford is so small and police officers would have known about it. Additionally, he testified it was not likely that Fresno Hell's Angels chapter would take orders from the San Diego chapter because chapters do not run other chapters. He also pointed out that it was unusual that women were involved in the events on the night of March 8, 2001, because the Hell's Angels normally don't involve women in these types of activities. This testimony was supportive of defendant's theory of defense that he was not aware of criminal activity within the Fresno chapter, he joined because he is a motorcycle enthusiast, the confrontation was a personal matter not orchestrated by the San Diego chapter, and there was no concern that the Mongols would take over the Exiled clubhouse.

Defendant focuses on excerpts from cross-examination of this expert which he claims supported the prosecution's theory. While the prosecution was able to ask some effective questions on cross-examination, for the most part defendant has misconstrued testimony of the defense expert in his brief. For example, defendant states that "not surprisingly, based on his 'expertise,' the professor agreed with the prosecutor that the courses he has taken relating to outlaw motorcycle gangs have taught him that the HA [Hell's Angels] are a criminal organization." This section of cross-examination can certainly be interpreted in a manner

20

different from that set forth by defendant. The People were asking the expert about a course he took and the instructor who taught the course. The People asked the following question, "And during that course did they not teach you that the Hell's Angels is a criminal organization?" The expert responded, "That was his feeling, yes."

Another example of defendant misconstruing the record in order to advance his attack on defense counsel and his chosen expert is shown by the following. Defendant contends that the defense expert was so uninformed that he "indicated that he believed Sonny Barger was the President of the Fresno Chapter of HA. Anyone who has testified almost 20 times as an expert on HA, as this defense witness claimed he had, should know that Sonny Barger, who 'does for the Hell's Angels what Lee Iaccoca does for Chrysler Corp.[,]' was not the President of the Fresno Chapter."

We begin with defendant's assertion that the defense expert claimed he "had testified almost 20 times as an expert on HA." The questioning on this subject was as follows:

"Q. [District Attorney] You indicated to Mr. Oliver that you've testified, qualified as an expert, I forget the exact number, over 20 times?

"A. [James Hernandez, defense expert] 18. Somewhere between 18 and 20.

"Q. Are we to take it-so I'm clear, you've testified as an expert on the issue of Hell's Angels 18 to 20 times?

"A. No, I have not. I testified on basic gangs under 186.22.

"Q. Have you ever qualified as an expert on the Hell's Angeles gang?

"A. I have not.

"Q. Have you ever testified as an expert on any outlaw motorcycle gang?

"A. No, I have not.

"Q. All the other 18 to 20 cases involved-

"A. Street gangs.

"Q. -gangs other than outlaw motorcycle gangs?

"A. Correct."

Thus directly contrary to defendant's contention on appeal, the defense expert stated he had never testified as an expert on Hell's Angels, but had testified between 18 and 20 times as a gang expert.

As far as the claim that the expert did not know who Sonny Barger was, the record again does not support defendant's assertion. The expert was asked on cross-examination if he spoke to any officers of the Hell's Angels organization. He replied that he had spoken to three officers. The questioning continued as follows:

"Q. And who was that?

"A. Jeff Ray, president Sacramento chapter; big Jim, really big Jim, sergeant at arms Sacramento chapter; and the president of the Fresno chapter-excuse me, I also talked to George Christie from Ventura and Sonny Barger on the telephone.

"Q. Who at the Fresno chapter did you speak with?

"A. He was the president, I forgot his name. It's in-that was in May. I don't recall his name.

"Q. Sonny Barger?

"A. Yes.

"Q. Does he have any criminal convictions?

"A. (Laughs.) Just a few.

"Q. And he is the sort of unofficial head of the Hell's Angels, is he not?

"A. That's correct.

"Q. The president of the Ventura chapter you spoke with?

"A. George Christie, yes."

When read in context, it is clear that the defense expert did not know the name of the president of the Fresno chapter. The prosecutor changed course and then asked him separately about Sonny Barger.

In short, the expert provided evidence beneficial to the defendant's case. While cross-examination may have exposed some possible flaws in the expert's theories, it did not transform the expert into an "extra 'expert' witness" for the People. Defense counsel was not ineffective on this point.

Defendant contends that his trial counsel told the court directly that defendant was only interested in obtaining an unethical attorney and he had colluded with his prior counsel and investigator to mislead the district attorney. Defendant contends that defense counsel told the court that defendant was upset because counsel was ethical. Although acknowledging that these comments were made in a Marsden hearing and were not before the jury, defendant argues that counsel violated attorney-client privilege and "could not but prejudice the court against him."

As the record reflects, defense counsel explained in the Marsden hearing that he had learned that prior counsel had possibly behaved unethically by adding names to the witness list of individuals he did not intend to call or investigate merely to mislead the district attorney. Counsel did not accuse defendant of being unethical but was only explaining why he was not calling the same witnesses on the list of prior counsel. Later, defense counsel stated that defendant was very upset that the district attorney's office and others in Kings County were crooked. Defense counsel was attempting to explain why defendant said that he (defense counsel) does not listen to him and defense counsel said that defendant was simply focused on his concern that he (defense counsel) played by the rules while others did not. Defense counsel explained that defendant was focused on what he viewed as corruption around him. Thus, again, appellate counsel has misconstrued the record. In any event, defendant has not shown that the trial court was impacted by any statements made by defense counsel during the course of a Marsden motion where defense counsel is required to defend his representation of

22

defendant and explain why things were or were not being done to defendant's satisfaction.

e. Effective Assistance of Counsel at Sentencing

Defendant argues that he was prejudiced at sentencing because his counsel did not provide any mitigating evidence to the court and did not correct errors in the probation officer's report. Although defendant concedes that the errors in the probation report may be essentially harmless, he points them out as evidence that defense counsel did not attend to his duty in ensuring that the probation report was accurate.

We begin again by analyzing defendant's skewed piecemeal version of the record at sentencing. Although (as pointed out by selected snippets of the record set forth by defendant on appeal) his defense counsel acknowledged weaknesses in defendant's approach that he did not do anything terribly out of line, defense counsel followed each of these statements with argument favorable to the defendant. For example, after acknowledging that defendant does not think he did anything wrong, counsel argued that defendant has come to the realization that he should not have joined the club, but when he joined he was naïve regarding the activities of the Hell's Angels. Defense counsel stated that he disagreed with defendant's opinion that he did not do anything wrong, but then argued that defendant was simply defending himself in a property dispute. He stated that defendant has a huge support system of family, friends, employer and coworkers. He asked the court to fashion a sentence that reflects leniency as to concurrency of acts. After the district attorney argued, defense counsel argued that defendant did show some remorse, that the attack was not preplanned, and that they were not trying to shut the club down. In addition, counsel pointed out that almost everyone got their property back.

Defendant has not shown that his counsel was ineffective in arguing at his sentencing hearing.

Defendant argues that the probation report contains factual errors and his counsel did not seek to correct each and every one of them. He fails to show prejudice from these errors. It is clear that the facts in the probation report do not exactly match the facts in evidence at trial. It is quite possible that the probation officer followed a common practice of relying on police reports to formulate the factual portion of the report; the likelihood of this is strong since the trial record was so lengthy and it is very unlikely that the reporter's transcript would have already been prepared for review at the time the probation officer was required to prepare the report. In addition, the sentencing judge was the same judge who presided over the lengthy trial. The trial court was clearly aware of the facts. We have no reason to doubt that the trial court based its sentencing decision on the facts as they came out at trial, and not on the facts as summarized in the probation officer's report. In any event, we note that most of the factual inaccuracies are trivial. Defendant has failed to show he was prejudiced by his claim that his counsel was ineffective in failing to correct errors in the probation officer's report.

f. Extrinsic Circumstances Enhancing the Incompetency of Counsel

Defendant now offers the position that it is understandable why his counsel was ineffective, because he was clearly overwhelmed with work. Defense counsel asked for a continuance in April of 2004. At this time he explained to the court that he had not had enough time to prepare. The court granted a continuance. As previously discussed, counsel was not ineffective at trial; furthermore, defense counsel was granted a continuance and defendant has failed to show that he was not prepared at trial.

(Doc. 23, Exh., pp. 28-46).

2.   <u>Federal Standard For Ineffective Assistance of Counsel</u>.

Effective assistance of appellate counsel is guaranteed by the Due Process Clause of the

Fourteenth Amendment. <u>Evitts v. Lucey</u>, 469 U.S. 387, 391-405 (1985). Claims of ineffective

assistance of appellate counsel are reviewed according to <u>Strickland 's</u> two-pronged test. <u>Miller v.</u>

<u>Keeney</u>, 882 F.2d 1428, 1433 (9th Cir.1989); <u>United States v. Birtle</u>, 792 F.2d 846, 847 (9th

Cir.1986); <u>see</u> <u>also</u> <u>Penson v. Ohio</u>, 488 U.S. 75(1988) (holding that where a defendant has been

actually or constructively denied the assistance of appellate counsel altogether, the <u>Strickland</u> standard

does not apply and prejudice is presumed; the implication is that <u>Strickland</u> does apply where counsel

is present but ineffective).

To prevail, Petitioner must show two things. First, he must establish that appellate counsel's

deficient performance fell below an objective standard of reasonableness under prevailing professional

norms. <u>Strickland v. Washington</u>, 466 U.S. 668, 687-88, 104 S.Ct. 2052 (1984). Second, Petitioner

must establish that he suffered prejudice in that there was a reasonable probability that, but for

counsel's unprofessional errors, he would have prevailed on appeal. <u>Id</u>. at 694. A "reasonable

probability" is a probability sufficient to undermine confidence in the outcome of the appeal. <u>Id</u>. The

relevant inquiry is not what counsel could have done; rather, it is whether the choices made by counsel

were reasonable. <u>Babbitt v. Calderon</u>, 151 F.3d 1170, 1173 (9th Cir.1998).

With the passage of the AEDPA, habeas relief may only be granted if the state-court decision

unreasonably applied this general <u>Strickland</u> standard for ineffective assistance.  <u>Knowles v.</u>

<u>Mirzayance</u>, 556 U.S. ___, 129 S.Ct. 1411, 1419 (2009).  Accordingly, the question "is not whether a

federal court believes the state court's determination under the <u>Strickland</u> standard "was incorrect but

whether that determination was unreasonable–a substantially higher threshold."  <u>Schriro v. Landrigan</u>,

550 U.S. 465, 473 (2007); <u>Knowles v. Mirzayance</u>, 556 U.S. ___, 129 S.Ct. at 1420.  In effect, the

AEDPA standard is "doubly deferential" because it requires that it be shown not only that the state

court determination was erroneous, but also that it was objectively unreasonable.  <u>Yarborough v.</u>

<u>Gentry</u>, 540 U.S. 1, 5 (2003). Moreover, because the <u>Strickland</u> standard is a general standard, a state

court has even more latitude to reasonably determine that a defendant has not satisfied that standard.

<u>See</u> <u>Yarborough v. Alvarado</u>, 541 U.S. 652, 664 (2004)("[E]valuating whether a rule application was

24

1    unreasonable requires considering the rule's specificity.  The more general the rule, the more leeway

2    courts have in reaching outcomes in case-by-case determinations").

3              3.   The State Court Adjudication Was Not Objectively Unreasonable.

4         Initially, the Court notes that the state court applied the correct federal standard, i.e.,

5    Strickland, to Petitioner's contentions regarding counsel's performance.[1]   Hence, the only question is

6    whether, having applied the correct test, the state court's application of Strickland was objectively

7    unreasonable.   Schriro v. Landrigan, 550 U.S. at 473.  The Court concludes that it was not.

8         The Court agrees with Respondent that Petitioner's claims of ineffective assistance are "mostly

9    generalities and conclusions" and, hence, insufficient to meet the pleading requirements for federal

10   habeas proceedings, and that, even if the allegations did meet federal pleading standards, they do not

11   support a conclusion that the state court's application of Strickland was objectively unreasonable.

12   (Doc. 23, p. 21).

13        Rule 2(c) of the Rules Governing Habeas Corpus Cases provides that a habeas petition must

14   specify all the grounds for habeas relief as well as the facts supporting each ground.  See Rule 2(c), 28

15   U.S.C. foll. § 2254.  A petition is required to set forth a "detailed statement" explaining his habeas

16   claims.  See Mayle v. Felix, 545 U.S. 644, 125 S.Ct. 2562 (2005)("Rule 2(c)…requires a…detailed

17   statement.  The habeas rule instructs petitioner to 'specify all the grounds for relief available to [him]'

18   and to 'state the facts supporting each ground.'"); see also McFarland v. Scott, 512 U.S. 849, 856, 114

19   S.Ct. 2568 (1994)("Habeas corpus petitions must meet heightened pleading requirements[.]").

20        In the first amended petition, Petitioner contends that "[c]ounsel failed to make proper

21   investigation, not even following up on actions already started by prior counsel; did not make

22   necessary objections at trial; failed to preserve issues for review; hired as his 'gang expert' someone

23   whose training and field of expertise was juvenile crime; and failed to familiarize himself with

24   applicable law in this case."  (Doc. 14, p. 22).  Petitioner then cites, as an example, an occasion when

25   counsel requested a continuance, giving as a reason that prior counsel had subpoenaed Navy records

26

27   ─────────────────────────
     [1]  Although the 5th DCA did not expressly cite to Strickland, it relied upon the standard set forth in People v. Gray, 37
28   Cal.4th 168 (2005), a decision of the California Supreme Court, which, in turn, applied Strickland in determining the issue
     of ineffective assistance of counsel.  Id., 37 Cal.4th at 207.

                                              25

that the Navy had refused to turn over.  (Id.).  Over the course of the ensuing six months, counsel first

told the court he did not know what to do about the Navy's refusal, then later indicated that some

effort should be made to obtain them, and then finally concluded that the records were part of a

"fishing expedition" that he refused to pursue.  (Id.).

Then, Petitioner discusses counsel's prior disciplinary history with the State Bar of California,

even referencing events that occurred more than thirty years earlier, apparently expecting the Court to

conclude that if counsel was negligent in one or more cases many years ago, he must therefore have

been negligent in this case.  (Id., p. 23).  Next, Petitioner mentions counsel's statement at a hearing on

Petitioner's motion to remove him as counsel that the reason Petitioner wanted him removed was that

counsel was ethical and played by the rules.  (Id.).  Petitioner also cites to counsel's acknowledgement

during the hearing on the removal motion that personality conflicts existed between counsel and

Petitioner that made representation difficult.  (Id., p. 24).  Finally, Petitioner mentions that counsel had

a heavy work load with many other cases and that counsel had apparently failed to fully review 20,000

pages of discovery in Petitioner's trial.  (Id., p.25).

None of these allegations, however, either individually or collectively, contain sufficient

factual detail to support a conclusion that trial counsel's performance was deficient.  For example, the

mere fact that counsel did not read all 20,000 pages of discovery is meaningless without establishing

that there was something in those 20,000 pages of discovery worth investigating or reviewing.

Similarly, counsel's failure to obtain Navy records, without more, is insufficient to support a finding

of negligence, since it has not been shown either (1) that the records could have been obtained from

the Navy; or (2) that, once obtained, the records would have assisted the defense.  Likewise, the mere

fact that the "gang expert" specialized in juvenile gangs does not in any way impugn the expert's trial

testimony, and no attempt has been made to establish that a "gang expert" who specialized in

motorcycle gangs would have been more helpful to the defense than the expert that counsel retained.

The contention that counsel did not make certain objections at trial is meaningless without identifying

which objections counsel should have made, the legal basis for such objections, and how the failure to

raise those objections prejudiced Petitioner's trial.  Finally, Petitioner attempt to impugn counsel's

performance in this trial by the fact that on prior occasions over the last thirty years, counsel had on

1  occasion been disciplined, is entirely unhelpful without first establishing a clear pattern of misbehavior

2  over that period of time that is consistent with specific misconduct that occurred in this case.

3          Given Petitioner's failure to substantiate his claim of ineffective assistance of counsel with

4  supporting facts or evidence, his assertion of ineffective assistance is simply too vague and conclusory

5  to justify a habeas remedy under the <u>Strickland</u> standard.  By only asserting that his counsel "failed to

6  investigate" or did not hire the proper expert witnesses or did not adequately review thousands of

7  pages of documents whose contents or relevance to the defense have never been explained, Petitioner

8  has not identified with any specificity the acts or omissions demonstrating that his counsel was, for

9  example, unprepared for trial or otherwise performed deficiently by not exercising reasonable

10  professional judgment.  Nor has Petitioner explained how his counsel's conduct prejudiced him.  <u>See</u>

11  <u>Strickland</u>, 466 U.S. at 690 ("A convicted defendant making a claim of ineffective assistance must

12  identify the acts or omissions of counsel that are alleged not to have been the result of reasonable

13  professional judgment.").

14          Indeed, throughout the vague and generalized claim of ineffective assistance in the instant

15  petition, Petitioner seems to assume that the Court is aware of the specific facts previously alleged in

16  great detail in his state court petitions, and reviewed by the state court, and that such facts are

17  somehow automatically incorporated by reference into the instant first amended petition.  That is not

18  the case.  Under Rule 2(c), as mentioned previously, Petitioner is required to allege *within the four*

19  *corners of the petition* those facts sufficient to establish a federal constitutional violation of the Sixth

20  Amendment.  The Court is not obligated to construct a claim for Petitioner nor will Petitioner be

21  allowed to incorporate by reference factual allegations made in state court proceedings.  <u>See e.g.</u>,

22  <u>Small v. Endicott</u>, 988 F.2d 411, 417-418 (7th Cir. 1993); <u>Cortez v. Clark</u>, 2011 WL 883019, at *12

23  (S.D. Cal. March 14, 2011).

24          In his Traverse, Petitioner fares no better.  The Traverse repeats the contention that counsel had

25  a busy trial schedule, that he was overworked, that he suggested Petitioner make a plea agreement, that

26  he believed Petitioner would be found guilty at trial, and that counsel did not review 20,000 pages of

27  discovery.  (Doc. 29, pp. 11-15).  Nowhere, however, does Petitioner directly correlate these

28  circumstances with specific, provable events that reflect defective performance and prejudice.  Rather,

Petitioner appears to contend that the existence of such a set of circumstances must have *necessarily* resulted in an attorney's sub-standard performance. While it may be true in the abstract that such circumstances would have the *potential* effect of preventing one or more attorneys, among the larger set of all attorneys, from competently being able to perform his or her duties, that is not the <u>Strickland</u> test. Petitioner's burden is to show, by specific and discernible evidence, that his trial counsel—in this case, not in some abstract or hypothetical case—actually provided representation that fell below <u>Strickland</u>'s reasonableness standard and thereby prejudiced Petitioner in the process, and that the state court's adjudication of that issue was objectively unreasonable. Simply describing circumstances and factors that might have affected some attorneys, without making any causal link between them and the performance of Petitioner's counsel in this trial, is grossly insufficient to establish ineffective assistance of counsel.

Accordingly, Petitioner has failed to meet his burden of proving that he is entitled to habeas relief (<u>Silva v. Woodford</u>, 279 F.3d 825, 835 (9th Cir. 2002)), as his claim of ineffective assistance is too vague and conclusory to warrant relief. <u>See James v. Borg</u>, 24 F.3d 20, 26 (9th Cir. 1994)(rejecting ineffective assistance of counsel claim and stating, "[c]onclusory allegations which are not supported by a statement of specific facts do not warrant habeas relief"); <u>United States v. Smith</u>, 924 F.2d 889, 896 (9th Cir. 1991)("[U]nsupported and conclusory claims are not sufficient to show error."). This is especially so given the precise requirements of <u>Strickland</u>, none of which have been met in this case. Give the foregoing discussion, it is evident that the state court's adjudication of this issue was not objectively unreasonable.

B. <u>Section 196.22 Is Not Unconstitutionally Vague And Does Not Impinge on the Right To Association or Due Process</u>.

Petitioner next challenges as unconstitutional California Penal Code § 186.22, arguing that it is impermissibly vague both on its face and as applied and, further, that it violates an individual's right to association under the First Amendment and Due Process. Petitioner contends that §186.22 (b)(1), the gang enhancement statute, is vague and overbroad and that it fails to adequately define gang membership in that gang membership is defined so broadly that few organizations are excluded. This contention is without merit.

1          1.   <u>The State Court Decision</u>.

2   The 5th DCA rejected Petitioner's claim as follows:

3   The Street Terrorism Enforcement and Prevention Act (STEP Act) was enacted by the
4   Legislature in 1988. It was enacted based on the Legislature's finding that "the State of
    California is in a state of crisis which has been caused by violent street gangs whose members
5   threaten, terrorize, and commit a multitude of crimes against the peaceful citizens of their
    neighborhoods." (Pen.Code, § 186.21.6)

6
7   The jury found true numerous gang enhancements under section 186.22, subdivision (b)(1).
    Proof of a gang enhancement requires that the defendant "is convicted of a felony committed
8   for the benefit of, at the direction of, or in association with any criminal street gang, with the
    specific intent to promote, further, or assist in any criminal conduct by gang members." A
9   criminal street gang is statutorily defined as "any ongoing organization, association, or group
    of three or more persons, whether formal or informal, having as one of its primary activities the
10  commission of one or more of the criminal acts enumerated in paragraphs (1) to (25),
    inclusive, of subdivision (e), having a common name or common identifying sign or symbol,
11  and whose members individually or collectively engage in or have engaged in a pattern of
12  criminal gang activity." (§ 186.22, subd. (f).)

13  Defendant contends that the STEP Act is unconstitutionally vague on its face and as applied
14  and also results in cruel and unusual punishment.

15  "A facial vagueness challenge is based on the due process clauses of the Fifth and Fourteenth
    Amendments to the United States constitution, and on article I, section 7 of the California
16  constitution. [Citation.] Under both the federal and state Constitutions, vagueness invalidates a
    criminal statute if the statute '"fail[s] to provide the kind of notice that will enable ordinary
17  people to understand what conduct it prohibits ..." ' or if it ' "may authorize and even
18  encourage arbitrary and discriminatory enforcement." [Citation.]' [Citations.]" (<u>In re Jorge G.</u>
    (2004) 117 Cal.App.4th 931, 938.)

19
20  Defendant acknowledges that "some" of his claims in this argument were not made in the trial
    court and would normally be considered waived on appeal. He argues, however, that the failure
21  on the part of his counsel to raise any of the issues he now raises on appeal resulted in
    extensive and egregious ineffective assistance of counsel and we should reach the merits of his
22  arguments.

23  We begin by noting that contrary to defendant's assertion that "some" of his claims were not
24  raised in the trial court, defendant has not shown, nor have we found, that any of his claims in
    this argument were raised and preserved in the trial court. Although defendant did not
25  challenge the STEP Act in the trial court as void for vagueness on its face, we shall address
    this argument because such a question is a pure question of law that is reviewable absent an
26  objection. (<u>People v. Yeoman</u> (2003) 31 Cal.4th 93, 118.)

27  In <u>People v. Sengpadychith</u> (2001) 26 Cal.4th 316 the California Supreme Court prefaced its
28  opinion with the statement that it has continued to struggle, step by step, "through the thicket

of statutory construction issues presented by the California Street Terrorism Enforcement and Prevention Act of 1988." (Id. at p. 319.) From this statement defendant argues that the California Supreme Court has had to struggle with the STEP Act, therefore persons of ordinary intelligence have struggled, and the Supreme Court's interpretations of the STEP Act come too late to enable such persons to modify their behavior and avoid the loss of liberty.

If defendant's theory that struggles over the correct interpretation of a law result in a valid facial vagueness challenge were true, there would be very few laws that would withstand such a challenge. While the intricacies of the STEP Act have been fine tuned by case law, the law provides detailed and sufficient notice of what conduct it prohibits. In fact, although not acknowledged by defendant, the California Supreme Court has held that the "detailed requirements of the STEP Act are sufficiently explicit to inform those who are subject to it what constitutes a criminal street gang for purposes of the act." (People v. Gardeley (1996) 14 Cal.4th 605, 623.)

Defendant continues his argument by stating that the case law surrounding the STEP Act has only made things worse. In this portion of his argument he criticizes holdings of the California Supreme Court, as well as some appellate court opinions. He fails to recognize that this court is bound by opinions of the California Supreme Court. (Auto Equity Sales, Inc. v. Superior Court (1962) 57 Cal.2d 450, 455.) It is not our place to disregard those opinions.

Continuing in his argument that the law is void for vagueness on its face, defendant launches into a criticism of case law allowing the use of law enforcement officers as expert witnesses to prove elements of the gang enhancement. Defendant claims that "when gang cops have not had training in psychology and sociology, they do not have the special skill, knowledge and training to properly evaluate what they observe in complex social groups such as gangs. This leads them to speculation and conjecture which is dependent upon lucky guesses and whatever they've picked up from the general education they received in grade school, high school and, occasionally, undergraduate college work.... Even where the prosecution's 'expert witnesses' in the instant case received training, their training was received from other law enforcement officers, with no showing of any specialized training in sociology or psychology."

While declaring as a truism that experts on gangs should have specialized training in gang sociology and psychology before they are allowed to testify, defendant does not back up his statement with any references to authority requiring the experts to meet his proposed standard of qualifications. Indeed, if defendant's specially trained experts were called to testify, we would offer the guess that their knowledge would be based primarily on information gathered and processed by law enforcement officers. We note that the information required to prove the elements of a criminal street gang under the STEP Act (an organization having three or more individuals, having as one of its primary activities the commission of criminal acts, having a common name or identifying sign or symbol, and engaging in a pattern of criminal gang activity) is precisely the type of information that is in the purview of law enforcement officers. The STEP Act itself does not require any deep delving into the social or psychological reasons for the behaviors.

Defendant concludes that if the STEP Act had been originally written in the form in which it now stands after case law has interpreted it, "rather than be[ing] transmogrified into a

methodology that facilitated lowering the burden of proof," it would be susceptible to a facial challenge for unconstitutionality. Not only are we bound by the California Supreme Court's interpretations of the STEP Act, but we do not believe that judicial interpretation of the act has altered the act into a statute that fails to provide notice that will enable ordinary people to understand what conduct it prohibits.

Next, defendant argues that as applied the STEP Act penalized him for exercising his associative rights and effectively proved his guilt by association. In particular, he argues that he was convicted based on the overwhelming evidence of the behavior of others, who may or may not have been gang members, and who have committed crimes, that may or may not be gang related. He again attacks the qualifications and training of law enforcement officers to act as experts.  He claims that he was convicted without a showing that he joined the group knowing of its illegal purposes and without the intention to further those purposes. This, he argues, is a clear violation of his individual right to associate with others.

First, we find that defendant has waived this argument by failing to raise it in the trial court. Although we find that defendant has waived this argument, we note that the association argument has been rejected by the California Supreme Court, a point that defendant has not discussed in his brief. The California Supreme Court in Gardeley rejected this argument and set it forth again in People v. Loeun (1997) 17 Cal.4th 1, 11. "[T]he STEP Act punishes conduct, not association." "The requisite 'pattern of criminal gang activity' is merely part of what the prosecution must prove to establish that the current crime is related to an ongoing 'criminal street gang.' ... Nothing in the statutory scheme suggests that the Legislature intended that the prosecution could prove this 'pattern' only if it could show that a defendant had knowledge of prior crimes committed by fellow gang members." (Id. at p. 10.)

As the last portion of this argument, defendant argues that the STEP Act is violative of the prohibition against cruel and unusual punishment by enhancing sentences based on acts of others.

Again we find that defendant has waived this argument by failing to raise it in the trial court and, as previously set forth, that defendant is punished for his conduct-not for his association with others who have committed the criminal acts necessary to show that the group involved is a criminal street gang. His punishment is not based on acts of others.

(Doc. 23, Exh., pp. 22-28).

      2.   Constitutional Standard For Vagueness.

At the time of petitioner's offenses, § 186.22 provided:

(b)(1) Except as provided in paragraph (2), any person who is convicted of a felony which is committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members, shall, upon conviction of that felony, in addition and consecutive to the punishment prescribed for the felony or attempted felony of which he or she has been convicted, be punished by an additional term . . . .

31

(e) As used in this chapter, "pattern of criminal gang activity" means the commission of, attempted commission of, conspiracy to commit, or solicitation of, sustained juvenile petition for, or conviction of two or more of the [enumerate] offenses, provided at least one of those offenses occurred after the effective date of this chapter and the last of those offenses occurred within three years after a prior offense, and the offenses are committed on separate occasions, or by two or more persons: . . . .

(f) As used in this chapter, "criminal street gang" means any ongoing organization, association, or group of three or more persons, whether formal or informal, having as one of its primary activities the commission of one or more of the statutorily enumerated criminal offenses and through its members engages in a pattern of criminal gang activity.

The test for vagueness is whether the statute fails "to give a person of ordinary intelligence fair notice that it would apply to the conduct contemplated." United States v. Rearden, 349 F.3d 608, 614 (9th Cir. 2003); Melugin v. Hames, 38 F.3d 1478 (9th Cir. 1994); see also Coates v. City of Cincinnati, 402 U.S. 611, 614, 91 S.Ct. 1686, 1688 (1971). When determining if a statute is vague, a court should look at the common understanding of the statute's terms. Broadrick v. Oklahoma, 413 U.S. 601, 608, 93 S.Ct. 2908 (1973); United States v. Fitzgerald, 882 F.2d 397, 398 (9th Cir. 1989). In addition, a statute must establish minimal guidelines for law enforcement and not grant law enforcement undue discretion. United States v. Sorenson, 914 F.2d 173, 174 (9th Cir. 1990); United States v. Van Hawkins, 899 F.2d 852, 854 (9th Cir. 1990). Finally, unless First Amendment freedoms are implicated, "a vagueness challenge may not rest on arguments that the law is vague in its hypothetical applications, but must show that the law is vague as applied to the facts of the case at hand." United States v. Johnson, 130 F.3d 1352, 1354 (9th 1997); Fitzgerald, 992 F.2d at 398.

Petitioner contends that the definition of a criminal street gang is vague and overbroad. Under California law, § 186.22 defines a criminal street gang as: (1) an ongoing association of three or more persons sharing a common name or common identifying sign or symbol; (2) one of the group's primary activities is the commission of one of the specified predicate offenses; and (3) the group's members "engage in or have engaged in a pattern of criminal gang activity." People v. Gardeley, 14 Cal.4th 605, 616-617 (1996). The term "pattern of criminal gang activity" is defined in § 186.22(e) as "the commission, attempted commission, or solicitation of two or more of [the statutorily enumerated 'predicate offenses'] . . ." Section 186.22(e) then lists the specific offenses that qualify as predicate offenses. Sale, possession, and offer for sale of controlled substances are included as predicate offenses. See Cal. Pen. Code § 186.22(e).

These requirements are not unconstitutionally vague and overbroad.  What makes § 186.22's definition of a criminal street gang sufficiently narrow so as not to include most organizations and associations in the United States *is the requirement that one of the group's primary activities be the commission of crime.*  See People v. Gamez,  235 Cal.App.3d 957, 971 (1991), *disapproved on other grounds in* Gardeley, 14 Cal.4th at 624 n.10.  The statute does <u>not</u> criminalize membership in a group per se; rather, it criminalizes the *active participation* in a criminal street gang by one who devotes a substantial part of his time and effort to the gang's *illegal activities*.  <u>Id</u>. at 972; People v. Green, 227 Cal.App.3d 692, 700 (1991).

Section 186.22 does not suffer from the same infirmity as the statute in Lanzetta v. New Jersey, 306 U.S. 451, 59 S.Ct. 616 (1939).  In Lanzetta, the state had made it unlawful to be a member of any gang whose members had been convicted for crimes or disorderly conduct.  <u>Id</u>. 306 U.S. at 452, 59 S.Ct. at 619.  The Supreme Court held that the phrase "known to be a member" was ambiguous and the statute failed to adequately define membership.  <u>Id</u>. 306 U.S. at 458, 59 S.Ct. at 621.  Unlike the statute in Lanzetta, § 186.22 does not criminalize gang membership per se.  Rather, § 186.22(a) criminalizes promoting, furthering, or assisting a criminal street gang in furtherance of its criminal purpose.  Also, § 186.22(b) enhances the sentence for a crime that is committed in furtherance of a gang's criminal purpose.

Petitioner's argument that the statute is so broad that the Los Angeles Police Department meets the definition of a criminal street gang is ill conceived, as is his argument in the Traverse that the statute conceivably could apply to Catholic nuns.  While the Catholic clergy and Los Angeles police officers undoubtedly share among their members a common name, dress, and purpose, the primary function of police or Catholic nuns, unlike a criminal street gang, is not the furtherance of an illegal activity.  See Gamez, 235 Cal.App.3d at 970-71.[2]  The lack of an illegal purpose to these groups

---

[2] Petitioner's contention that Los Angeles police are excluded from the statute's street gang definition "only because the Gamez court said so," is puzzling.  (Doc. 14, p. 30).  Presumably, Petitioner is arguing that the statute's text is so broad as to include most organizations and associations, even lawful ones, within its prevue.  Gamez, in construing the statute, did not engraft new meanings onto the statute, but instead simply relied upon the statutory text itself, which, as mentioned above, requires that to be a criminal street gang, the group have as one of its primary activities the commission of one of the specified predicate offenses and that its members "engage in or have engaged in a pattern of criminal gang activity."   § 186.22.  Any contention that the Los Angeles Police Department meets those two criteria is specious.

1    excludes police officers, judges, Catholic nuns, Buddhist monks, the Boy Scouts of America, the

2    Republican and Democratic Parties, the Los Angeles Lakers, AARP members, and the vast majority of

3    organizations in the United States from the ambit of "criminal street gangs" as defined in § 186.22.

4           Section 186.22 specifically lists the conduct that makes a group a <u>criminal</u> street gang. Section

5    186.22 provided sufficient information for the jury to determine if petitioner was a member of a gang,

6    if petitioner's gang's primary activity was the commission of crimes, if the gang's members engaged

7    in a pattern of criminal activity, and if petitioner's offenses were committed "to promote, further, or

8    assist in any criminal conduct by gang members."  Cal. Penal Code § 186.22(b) (1991); <u>In re Alberto</u>

9    <u>R.</u>, 235 Cal.App.3d 1309, 1323 (1991).  The 5th DCA's finding that § 186.22 is not unconstitutionally

10   vague or overbroad was not contrary to or an unreasonable application of clearly established Federal

11   law, and as such, no habeas relief is available.  <u>See</u> 28 U.S.C. § 2254(d).

12          Equally unavailing is Petitioner's claim that the statute violates his First Amendment right to

13   free association and to due process.  Among the rights protected by the First Amendment is the right

14   of individuals to associate to further their personal beliefs. While the freedom of association is not

15   explicitly set out in the Amendment, it has long been held to be implicit in the freedoms of speech,

16   assembly, and petition."  <u>Healy v. James</u>, 408 U.S. 169, 181, 92 S.Ct. 2338 (1972); <u>see also Roberts v.</u>

17   <u>U.S. Jaycees</u>, 468 U.S. 609, 622, 104 S.Ct. 3244 (1984). However, "[t]he freedom of association

18   protected by the First Amendment does not extend to joining with others for the purpose of depriving

19   third parties of their lawful rights." <u>Madsen v. Women's Health Ctr., Inc.</u>, 512 U.S. 753, 776, 114 S.Ct.

20   2516, 129 L.Ed.2d 593 (1994); <u>see Villegas v. City of Gilroy</u>, 484 F.3d 1136, 1142 (9th Cir.2007)

21   ("[T]he First Amendment's freedom of association protects groups whose activities are explicitly

22   stated in the amendment: speaking, worshiping, and petitioning the government." (quoting <u>IDK, Inc.</u>

23   <u>v. Clark County</u>, 836 F.2d 1185, 1192 (9th Cir.1988))).

24          Whatever the scope of Petitioner's First Amendment right of association, it does not encompass

25   a right to associate with active members of a criminal street gang for the purpose of engaging in crime.

26   <u>Madsen</u>, 512 U.S. at 776.  In addition, the gang enhancement statute does not penalize Petitioner for

27   mere association, but for committing felonies "for the benefit of, at the direction of, or in association

28   with any criminal street gang, with the specific intent to promote, further, or assist in any criminal

34

conduct by gang members." Cal.Penal Code § 186.22(b)(1); see People v. Loeun, 17 Cal.4th 1, 11 (1997) ("[T]he STEP Act does not criminalize group membership.... [T]he STEP Act punishes conduct, not association.").

Accordingly, the state court's rejection of Petitioner's contention regarding free association and due process was neither contrary to nor an unreasonable application of clearly established federal law.

C. Admission of Gang Evidence.

Next, Petitioner alleges that the trial court's admission of an "abundance" of gang evidence violated his right to due process. This contention is also without merit.

1. The 5th DCA's Opinion.

The state court rejected Petitioner's claim as follows:

a. Admission of Prejudicial Hell's Angels Evidence

As set forth in the statement of the facts, the prosecution presented a vast accumulation of evidence regarding the Hell's Angels in general, criminal activities of the Hell's Angels, and convictions of selected members of various Hell's Angels chapters throughout the United States and Canada. With the exception of minute portions of this evidence, defense counsel did not object to the admission of this evidence.

"[E]vidence of gang membership is often relevant to, and admissible regarding, the charged offense. Evidence of the defendant's gang affiliation-including evidence of the gang's territory, membership, signs, symbols, beliefs and practices, criminal enterprises, rivalries, and the like-can help prove identity, motive, modus operandi, specific intent, means of applying force or fear, or other issues pertinent to guilt of the charged crime." (People v. Hernandez (2004) 33 Cal.4th 1040, 1049.)

"[I]t has repeatedly been held that it is proper to introduce evidence which is even unpleasant or negative pertaining to an organization in issue which is relevant on the issue of motive or on the subject matter at trial." (People v. Frausto (1982) 135 Cal .App.3d 129, 140.)

"In People v. Remiro (1979) 89 Cal.App.3d 809, 841-844, it was proper to introduce evidence of various criminal acts of a terrorist [sic ] group, the Symbionese Liberation Army, in order to show the nature of the conspiracy pertaining to a murder.

"In the same manner, in People v. Manson (1976) 61 Cal.App.3d 102, 131, 155-156, it was proper to introduce evidence of the social structure, religion, and criminal activities of an organization known as the 'Family' because of its relevancy to the motivation and the nature of the conspiracy of the Tate-LaBianca murders. In In re Darrell T. (1979) 90 Cal.App.3d 325, 328-334, the court discussed evidence concerning the history and nature of various juvenile gangs as it pertained to the proof of the existence of a motive relative to the crime of murder. In People v. Beyea (1974) 38 Cal.App.3d 176, 194, evidence concerning a membership in the Hell's Angels was deemed to be properly introduced relative to the issue of motive." (People v. Frausto, supra, 135 Cal.App.3d at pp. 140-141.)

The prosecution's theory of this case was that what occurred here was not the result of a dispute among past and former Exiled members nor was it a personal dispute between defendant and Goonan, but that the acts were all motivated by the Hell's Angels' decision to make sure the Exiled club did not continue in Mongols territory. In addition, the prosecutor presented evidence that defendant was motivated to beat up Goonan in order to advance in the Hell's Angels organization and that the manner in which the attack occurred followed the modus operandi of the Hell's Angels organization. Thus it was relevant for the prosecution to present evidence demonstrating that the Hell's Angels is a worldwide organization with structure and rules that must be followed by each of its chapters and also relevant to show that the Hell's Angels at times achieves its goals by utilizing violence and intimidation. In addition, the People were entitled to present evidence relating to the convictions necessary as proof of STEP Act criminal gang enhancement.

Defendant argues that this evidence was erroneously admitted. He claims that 49 percent of the evidence was irrelevant to the charges because it did not come within the purview of the STEP Act, the evidence was highly prejudicial, and some relevant evidence was cumulative. He acknowledges that "some" of the claims were not made in the trial court but argues that the failure on the part of counsel to raise a meritorious claim resulted in ineffective assistance of counsel. Defendant makes a passionate argument that the evidence was irrelevant and prejudicial and the sheer volume of evidence "dumped" on the jury was overwhelming.

Citing People v. Hernandez, supra, 33 Cal.4th at pages 1051-1052, defendant argues that trial courts should carefully scrutinize gang evidence before admitting it. He continues and quotes a small portion of the case to assert that in "'the extraordinary case in which unprotested evidence ... is a dominant part of the evidence against the accused, and is highly prejudicial and minimally relevant to any legitimate purpose' the court should [exclude the evidence] sua sponte."

Defendant quotes the Hernandez case completely out of context. The Hernandez court was determining whether a trial court should give a limiting instruction on the use of gang evidence and stated that the court does not have a sua sponte duty to give such an instruction, but should give it on request. It went on to note that in People v. Collie (1981) 30 Cal.3d 43 it found that there could be a possible exception to the rule that the trial court is not required to give a limiting instruction on gang evidence sua sponte. This exception was in "'an occasional extraordinary case in which unprotested evidence ... is a dominant part of the evidence against the accused, and is both highly prejudicial and minimally relevant to any legitimate purpose.'" (People v. Hernandez, supra, 33 Cal.4th at pp. 1051-1052.) The Hernandez case does not stand for the proposition that the trial court has a sua sponte duty to exclude gang evidence.

The philosophy behind and the reasons for requiring an objection in the trial court, in particular a specific objection, was recently reiterated in People v. Partida (2005) 37 Cal.4th 428. "'A verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous admission of evidence unless: [¶] (a) There appears of record an objection to or a motion to exclude or to strike the evidence that was timely made and so stated as to make clear the specific ground of the objection or motion ....' (Italics added.) 'In accordance with this statute, we have consistently held that the "defendant's failure to make a timely and specific objection" on the ground asserted on appeal makes that ground not cognizable. (People v. Green (1980) 27 Cal.3d 1, 22 [objection on ground that questions were leading does not preserve appellate argument that the evidence was impermissible evidence of other crimes]; ... )' [Citation.]

"A century ago, long before the Evidence Code existed, we explained the need for a specific objection. 'To require this is simply a matter of fairness and justice, in order that cases may be tried on their merits. Had attention been called directly in the court below to the particular objection which it is now claimed the general objection of appellant presented, that court

would have had a concrete legal proposition to pass on, and counsel for plaintiff would have been advised directly what the particular complaint against the question was, and, if he deemed it tenable, could have withdrawn the inquiry or reframed his question to obviate the particular objection. Trial judges are not supposed to have the numerous, varied, and complex rules governing the admissibility of evidence so completely in mind and of such ready application that under an omnivagant objection to a question they can apply with legal accuracy some particular principle of law which the objection does not specifically present.' [Citations.]

"The objection requirement is necessary in criminal cases because a 'contrary rule would deprive the People of the opportunity to cure the defect at trial and would "permit the defendant to gamble on an acquittal at his trial secure in the knowledge that a conviction would be reversed on appeal." [Citation.] 'The reason for the requirement is manifest: a specifically grounded objection to a defined body of evidence serves to prevent error. It allows the trial judge to consider excluding the evidence or limiting its admission to avoid possible prejudice. It also allows the proponent of the evidence to lay additional foundation, modify the offer of proof, or take other steps designed to minimize the prospect of reversal.' [Citation.]" (People v. Partida, supra, 37 Cal.4th at p. 434.)

Defendant is thus left to the argument: Could there be no satisfactory explanation for counsel's failure to object, i.e. no rational tactical purpose? As previously set forth, the People properly could present gang evidence on the question of motive and modus operandi relating to the felony charges and could present STEP Act evidence relating to the enhancements. Thus, even if defendant had objected he would not have been successful in excluding all of this evidence. Furthermore, we find that defendant made a calculated rational choice to have all of the evidence admitted at trial.

Throughout his examination of witnesses and presentation of his defense, including his closing argument, defense counsel had numerous tactical reasons for allowing the evidence to come in. In particular, defendant acknowledged and even promoted the idea that members of the Hell's Angels are extremely violent and operate an extensive drug trade. From this defense, counsel argued that there was no similar evidence linked to the Fresno chapter of the Hell's Angels and that defendant had no knowledge that the Hell's Angels organization was involved in such activities. He argued that defendant loved motorcycles and respected the Hell's Angels as a professional motorcycle group, not as a criminal organization. Defense counsel objected to evidence, and did so successfully on several occasions, linking Fresno Hell's Angels in any way to criminal activities, either violent or drug related. Thus defense counsel attempted to distance the Fresno Hell's Angels from the Hell's Angels in general. This was a valid tactical choice. In addition, defense counsel did not object to evidence demonstrating the Hell's Angels' hatred of law enforcement. The clear tactical reason for this was to strongly imply that the feeling of hatred for law enforcement by the Hell's Angels was reciprocated by law enforcement and thus law enforcement had a motive and bias to try and prove that this crime was part of the Hell's Angels organization. In addition, defense counsel sought to show that Goonan, Clark, and Randazzo were afraid of members from the San Diego Hell's Angels and therefore twisted their statements and testimony to make the March 2001 Fresno County activities into Hell's Angels crimes, rather than a personal matter between Goonan and defendant, or between defendant and current Exiled members, so they could enter the witness protection program and be protected from the problems encountered in San Diego.

The above described tactical reasons for not objecting were reasonable.

b. Expert Witness Testimony

In addition to challenging the qualifications of the expert witnesses (or, as defendant calls them, "gang cops") in his arguments regarding vagueness, defendant reiterates that claim and also raises three separate issues regarding the expert testimony in this case. Again, defendant

does not raise these three separate claims under the rubric of ineffective assistance of counsel, but raises them as separately cognizable claims on appeal. We again find that defendant failed to challenge the expert testimony or the qualifications of the experts in the trial court and has thus waived these claims for purposes of appeal except in the context of ineffective assistance of counsel.

We briefly discuss his assertions and the faultiness of his premises, underscoring the weakness of his arguments and further illustrations of why counsel was not ineffective.

Defendant first argues that it was erroneous to allow law enforcement to testify as experts at all because of their lack of expertise and because expert testimony was not necessary on certain elements of the STEP Act. In doing so he implicitly asks us to disregard the long line of cases establishing many factors relating to gangs and the STEP Act that are the proper subject of expert testimony. (See People v. Gardeley, supra, 14 Cal.4th at p. 617, People v. Killebrew, supra, 103 Cal.App.4th at pp. 653-658.) We decline to depart from this well-reasoned line of authority. Counsel was not ineffective in failing to object to the expert qualifications of the expert witnesses.

Defendant avers that the law enforcement experts testified only to activities guaranteed to inflame the jury and to confuse the issues. In addition, defendant argues that the evidence was cumulative As previously discussed, defense counsel had a tactical reason for allowing the experts to testify to extensive evidence regarding Hell's Angels involved in chapters outside of the Fresno chapter.

In a separate argument defendant states the use of law enforcement officers was error because they did not qualify as expert witnesses and they were allowed to serve as conduits for inadmissible evidence. He recognizes that his argument is difficult in light of the rulings of California courts involving expert witnesses for gang evidence and the STEP Act. We need not speak further to this issue other than to note that it is a rehashing of the issues previously discussed and rejected, that there was no objection on this ground in the trial court, and that defense counsel made a tactical decision to allow the admission of this evidence.

(Doc. 23, Exh., pp. 29-35).

      2.   Due Process.

First, as Respondent correctly argues, the United States Supreme Court has expressly left open the question of whether the admission of propensity evidence violates due process.  See  Estelle v. McGuire, 502 U.S. at 75, n. 5; see Holgerson v. Knowles, 309 F.3d 1200, 1202 (9th Cir.2002) (habeas relief not warranted unless due process violation clearly established by the Supreme Court); Garceau v. Woodford, 275 F.3d 769, 774 (9th Cir. 2001), reversed on other grounds, Woodford v. Garceau, 538 U.S. 202 (2003)(the Supreme Court "has never expressly held that it violates due process to admit other crimes evidence for the purpose of showing conduct in conformity therewith....").  In this regard, in Holley v. Yarborough, 568 F.3d 1091 (9th cir. 2009), the Ninth Circuit explained as follows:

The Supreme Court has made very few rulings regarding the admission of evidence as a violation of due process.  Although the Court has been clear that a writ [of habeas corpus] should be issued when constitutional errors have rendered the trial fundamentally unfair

1   [Citations], it has not yet made a clear ruling that admission of irrelevant or overtly prejudicial
2   evidence constitutes a due process violation sufficient to warrant issuance of the writ.

3   <u>Holley</u>, 568 F.3d at 1101.  Hence, the state courts' rejection of Petitioner's claim *could not* have been

4   "contrary to, or an unreasonable application of, clearly established" United States Supreme Court

5   authority, since no such "clearly established" Supreme Court authority exists.  28 U.S.C. §

6   2254(d)(1).

7       Second, even if the foregoing were not true, Petitioner's claim sounds only in state law and is

8   therefore not cognizable in federal habeas proceedings. A federal habeas corpus court has no authority

9   to review a state's application of its own laws, but rather must determine whether a prisoner's

10  constitutional or other federal rights have been violated.  <u>Estelle v. McGuire</u>, 502 U.S. 62, 67-68

11  (1991); <u>Jackson v. Ylst</u>, 921 F.2d 882, 885 (9th Cir. 1990).  Generally, the admissibility of evidence is

12  a matter of state law, and is not reviewable in a federal habeas corpus proceeding.  <u>Estelle</u>, 502 U.S. at

13  67; <u>Middleton v. Cupp</u>, 768 F.2d 1083, 1085 (9th Cir.), *cert. denied,* 478 U.S. 1021 (1985).

14      Nevertheless, there can be habeas relief for the admission of prejudicial evidence if the

15  admission was fundamentally unfair and resulted in a denial of due process.  <u>Estelle</u>, 502 U.S. at 72;

16  <u>Pulley v. Harris</u>, 465 U.S. 37, 41 (1984); <u>Walters v. Maas</u>, 45 F.3d 1355, 1357 (9th Cir. 1995); <u>Jeffries

17  v. Blodgett</u>, 5 F.3d 1180, 1192 (9th Cir. 1993), *cert. denied*, 510 U.S. 1191 (1994); <u>Gordon v. Duran</u>,

18  895 F.2d 610, 613 (9th Cir.1990).  However, the failure to comply with state rules of evidence alone is

19  neither a necessary nor a sufficient basis for granting federal habeas relief on due process grounds.

20  <u>Jammal v. Van de Kamp</u>, 926 F.2d 918, 919-920 (9th Cir. 1991).  Only if there are no permissible

21  inferences that the jury may draw from the evidence can its admission rise to the level of a due process

22  violation.  <u>Id</u>. at 920.  Intent is a permissible inference that the jury may draw from the evidence of

23  prior bad acts.  <u>See</u>, <u>Houston v. Roe</u>, 177 F.3d 901, 910 n. 6 (9th Cir. 1999).  Here, Petitioner has failed

24  to show that no permissible inferences existed that the jury might draw from the challenged evidence;

25  accordingly, it does not rise to the level of a federal claim and is, therefore, simply an issue of state

26

27

28

39

law.[3]

Third, Petitioner's counsel did not object to the admission of the now-challenged evidence at trial. Accordingly, as Respondent has correctly noted, the claim is thus procedurally barred. (Doc. 23, p. 40). A federal court will not review a claim of federal constitutional error raised by a state habeas petitioner if the state court determination of the same issue "rests on a state law ground that is independent of the federal question and adequate to support the judgment." Coleman v. Thompson, 501 U.S. 722, 729, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991). This rule also applies when the state court's determination is based on the petitioner's failure to comply with procedural requirements, so long as the procedural rule is an adequate and independent basis for the denial of relief. Id. at 730, 111 S.Ct. 2546. For the bar to be "adequate," it must be "clear, consistently applied, and well-established at the time of the [ ] purported default." Fields v. Calderon, 125 F.3d 757, 762 (9th Cir.1997). For the bar to be "independent," it must not be "interwoven with the federal law." Michigan v. Long, 463 U.S. 1032, 1040–41, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983). If an issue is procedurally defaulted, a federal court may not consider it unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice. Coleman, 501 U.S. at 749–50, 111 S.Ct. 2546.

In Bennett v. Mueller, the Ninth Circuit held:

> Once the state has adequately pled the existence of an independent and adequate state procedural ground as an affirmative defense, the burden to place that defense in issue shifts to the petitioner. The petitioner may satisfy this burden by asserting specific factual allegations that demonstrate the inadequacy of the state procedure, including citation to authority demonstrating inconsistent application of the rule. Once having done so, however, the ultimate burden is the state's.

322 F.3d 573, 586 (9th Cir.2003).

---

[3] Merely placing a "due process" label on an alleged violation does not entitle Petitioner to federal relief. Langford v. Day, 110 F.3d 1386, 1388-89 (1996). Broad, conclusory allegations of unconstitutionality are insufficient to state a cognizable claim. Jones v. Gomez, 66 F.3d 199, 205 (9th Cir.1995); Greyson v. Kellam, 937 F.2d 1409, 1412 (9th Cir.1991) (bald assertions of ineffective assistance of counsel did not entitle the petitioner to an evidentiary hearing; see also Hiivala v. Wood, 195 F.3d 1098, 1106 (9th Cir.1999), citing Gray v. Netherland, 518 U.S. 152, 162-63 (1996) ("general appeals to broad constitutional principles, such as due process, equal protection, and the right to a fair trial, are insufficient to establish exhaustion).

1  Under California law, a judgment may not be reversed by reason of the erroneous admission of

2  evidence unless "[t]here appears of record an objection to or a motion to exclude or to strike the

3  evidence that was timely made and so stated as to make clear the specific ground of the objection or

4  motion." Cal. Evid.Code § 353(a). In <u>Melendez v. Pliler</u>, 288 F.3d 1120, 1125 (9th Cir.2002), the

5  Ninth Circuit held that California's contemporaneous objection doctrine is clear, well-established, and

6  has been consistently applied when a party has failed to make any objection to the admission of

7  evidence.  Here, Petitioner did not respond in his Traverse to this argument when raised in the Answer

8  by Respondent.  Because Petitioner has not taken issue with the application of California's

9  contemporaneous objection rule, this Court need not consider Petitioner's claim.

10  Finally, as noted above, only when "there are *no* permissible inferences the jury may draw

11  from the evidence" and it renders the trial fundamentally unfair will an evidentiary ruling violate

12  federal due process.  <u>Windham</u>, 163 F.3d at 1102; <u>Jammal</u>, 926 F.2d at 919-920; <u>see also Boyde v.</u>

13  <u>Brown</u>, 404 F.3d 1159, 1172 (9th Cir. 2005)("A habeas petitioner bears a heavy burden in showing a

14  due process violation based on an evidentiary decision.").

15  Here, as the state appellate court reasonably concluded, the evidence regarding the wide array

16  of prior acts committed by various Hell's Angels clubs and individual members were all relevant to

17  show that the Hell's Angels organization was "a worldwide organization with structure and rules that

18  must be followed by each of its chapters," that the organization "at times achieve[d] its goals by

19  utilizing violence and intimidation," and that the acts charged were committed in furtherance of that

20  organization.  These are proper and legitimate inferences the jury could have drawn from the proffered

21  evidence.  Therefore, admission of this evidence did not rise to a federal due process violation.

22  <u>Windham</u>, 163 F.3d at 1102.

23  D.  <u>Admission Of Weaponry Evidence</u>.

24  Finally, Petitioner contends that the trial court's admission of voluminous evidence regarding

25  weaponry violated his right to federal due process.  Again, this contention lacks merit.

26  1.  <u>The State Court Adjudication</u>.

27  The state court rejected Petitioner's claim as follows:

28

41

In a third and separate claim, defendant argues that it was error to admit into evidence numerous weapons, ammunition, and body armor, and error to allow expert witnesses to testify on these irrelevant issues.

We begin by noting that, although there were no allegations against defendant regarding the use of a weapon during the March 2001 events, there was certainly testimony that there were guns in the Exiled clubhouse during both events. The question of who was armed, and who was not, presented a relevant inquiry. Also, the presence of weapons was relevant to the People's claim that the Hell's Angels is a violent criminal street gang that not only uses weapons to inflict death or injury, but uses weapons as a method of intimidation. Again, there was no objection to the admission of weapons found during search warrants, or to the admission of armor or particular types of ammunition. Defense counsel questioned the witnesses testifying to the weapons and ammunition found during searches as to whether or not the weapons were illegal. With one or two exceptions, the weapons and related items were not illegal and were lawfully possessed. This played into defense counsel's assertions that the prosecution was trying to portray the Hell's Angels in the most unflattering light possible, when in fact the possession of weapons by the members of the Fresno chapter was legal.

(Doc. 23, Exh., p. 35).

    2.   Discussion.

First, as was true in the preceding argument, Petitioner failed to object at trial to the admission of this evidence and thus is procedurally barred from raising the claim at this juncture. Melendez v. Pliler, 288 F.3d at 1125.  Second, as mentioned previously, no "clearly established federal law" exists regarding whether propensity evidence violates due process, see Estelle, 502 U.S. at 75, n. 5, and therefore, by definition, the state court adjudication could not have been contrary to or an unreasonable application of a legal standard that has not yet been articulated by the Supreme Court.

Finally, even assuming, arguendo, that the issue has been preserved for a ruling on the merits, it fails.  The jury could have drawn the same permissible inferences from this evidence as they could have with the prior claim, i.e., that the Hell's Angels organization was "a worldwide organization with structure and rules that must be followed by each of its chapters," that the organization "at times achieve[d] its goals by utilizing violence and intimidation," and that the acts charged were committed in furtherance of that organization.   Additionally, as the 5th DCA observed, identifying who was armed and who was not armed during the course of these various altercations was critical to an understanding of both what transpired, why it transpired, what motivated the actors, to what extent individuals were in danger as a result of weapons and to what extent heightened force in self-defense was a reasonable response to that danger.  Also, as noted by the 5th DCA, most of the weapons were lawfully in the possession of members of the various organizations, thus "play[ing] into defense

42

1  counsel's assertions that the prosecution was trying to portray the Hell's Angels in the most

2  unflattering light possible, when in fact the possession of weapons by the members of the Fresno

3  chapter was legal." (Doc. 23, Ex. at 35). Indeed, in closing argument, defense counsel made the

4  following argument to the jury:

5      It's not illegal to have guns, ladies and gentlemen. None of the guns that have been shown
       here are shown to be illegal. They're not unlawful.

6
       [P]urported actions of the Hell's Angels as a group or as a club are not any different than any
7      other business, and possession of handguns is not, or any other guns, if legal, are not any
       different than other people possessing guns in their households.

8

9  (RT 7428; 7434). Thus, permissible inferences could be drawn from the evidence regarding weapons,

10 thereby foreclosing any due process claim.

11         To the extent that this claim also suggests ineffective assistance by trial counsel in failing to

12 object to the weapons evidence, defense counsel's clear effort to use the legality of the weapons found

13 and introduced into evidence at trial for the purpose of portraying the Hell's Angels not as a criminal

14 organization but a law-abiding club is a reasonable, although ultimately unsuccessful, strategic

15 decision by the defense that forecloses any claim of ineffective assistance. Although the

16 reasonableness of counsel's actions is best described as a question of law, whether his actions were

17 "tactical," is a question of fact. Edwards v. Lamarque, 475 F.3d 1121, 1126 (9th Cir. 2007).

18 Therefore, this Court must determine whether the 5th DCA's depiction of counsel's decision as

19 "tactical" was a reasonable determination of the facts in light of the evidence before it, and, if so, then

20 whether counsel's choice was reasonable. Id.; Taylor v. Maddox, 366 F.3d 992- 999-1000 (9th Cir.

21 2004).

22         In light of the earlier discussion in this section, it seems evident that trial counsel intentionally

23 argued to the jury the legality of the guns introduced into evidence in order to rebut the prosecution's

24 attempt to portray the Hell's Angels as a criminal organization, and also, possibly, to sound the theme

25 of gun ownership as a legal and constitutional right and activity, a theme that would resonate with jury

26 members in a conservative and rural community like Kings County. Certainly, counsel's closing

27 argument regarding legal gun ownership by Petitioner and his fellow Hell's Angels is neither

28 inadvertent nor accidental; it was clearly intended to strike a chord that would make Petitioner less

1    threatening and more sympathetic to the jurors.  Accordingly, the Court can only conclude that the 5th

2    DCA's factual determination that counsel's decision not to object to the weapons evidence was a

3    tactical one.  Given that, its reasonableness also seems obvious:  in light of the overwhelming evidence

4    that was admitted concerning the illegal activities of Hell's Angels chapters in other areas of North

5    America as well as within California, evidence that involved testimony regarding weapons and their

6    use in achieving violent ends, it was a reasonable tactical decision by counsel to attempt to mitigate

7    that perspective by portraying the organization and its members as rough but generally law-abiding

8    citizens who had made the effort to ensure that all of their weapons complied with federal, state, and

9    local laws on gun ownership and use.  The fact that the tactic was not successful in obtaining an

10   acquittal in no way makes it unreasonable.  Edwards, 475 F.3d at 1127.  Accordingly, to the extent

11   that Petitioner is contending ineffective assistance of counsel, that claim must be rejected.

12                                          **RECOMMENDATION**

13           Accordingly, the Court RECOMMENDS that Petitioner's Amended Petition for Writ of

14   Habeas Corpus (Doc. 1), be DENIED with prejudice.

15           This Findings and Recommendation is submitted to the United States District Court Judge

16   assigned to the case, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 304 of the Local

17   Rules of Practice for the United States District Court, Eastern District of California.  Within twenty

18   (20) days after being served with a copy of this Findings and Recommendation, any party may file

19   written objections with the Court and serve a copy on all parties.  Such a document should be

20   captioned "Objections to Magistrate Judge's Findings and Recommendation."

21   ///

22   ///

23   ///

24   ///

25   ///

26   ///

27   ///

28

                                                    44

1        Replies to the Objections shall be served and filed within ten (10) <u>court</u> days (plus three days if

2   served by mail) after service of the Objections.  The Court will then review the Magistrate Judge's

3   ruling pursuant to 28 U.S.C. § 636 (b)(1)(C).  The parties are advised that failure to file objections

4   within the specified time may waive the right to appeal the Order of the District Court.  <u>Martinez v.</u>

5   <u>Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

6

7   IT IS SO ORDERED.

8     Dated:   **February 12, 2013**          **/s/ Jennifer L. Thurston**

9                            UNITED STATES MAGISTRATE JUDGE